1
2
3
4
5

IN THE UNITED STATES DISTRICT COURT

6
7

FOR THE NORTHERN DISTRICT OF CALIFORNIA

8

CTIA - THE WIRELESS ASSOCIATION,

9

        Plaintiff,                    No. C 10-03224 WHA

10

  v.

11

THE CITY AND COUNTY OF SAN        **NOTICE REGARDING**

12

FRANCISCO, CALIFORNIA,           **CORRESPONDENCE**

13

        Defendant.

                              /

14
15

      For reasons unclear, the appended material was sent to the Court.  Ms. Franklin does not

16

move to intervene and requests no further relief than that her submission be made part of the

17

record.

18
19
20

Dated:  April 12, 2011.

21

WILLIAM ALSUP
UNITED STATES DISTRICT JUDGE

22
23
24
25
26
27
28

*United States District Court*
For the Northern District of California

Cynthia Franklin
520 Ridgeway Drive
Bellingham, WA 98225
360-201-3959

**RECEIVED**

APR 1 1 2011

RICHARD W. WIEKING
CLERK, U.S. DISTRICT COURT
NORTHERN DISTRICT OF CALIFORNIA

# United States District Court
## Northern District of California - San Francisco Division

RE:   CTIA - The Wireless Association,
                    Plaintiff
                    v.
        The City and County of San Francisco, California,
                    Defendant

Case #:  10 3224  WHA

## Application to File
## Brief of Amicus Curiae
April 8, 2011

(in support of Defendant)

*Cynthia W. Franklin*

Cynthia W. Franklin

Dear Sir or Madam:

I am an independent consumer cell phone safety advocate and FCC regulatory "watchdog". I reside in the State of Washington and am not an attorney. My interest in this case is that I have worked for over 2 years as a concerned citizen/activist, lobbying the FCC, my Congressional representatives and writing articles in support of cell phones having adequate consumer safety disclosure warnings regarding radiation exposure. In December, 2009, I represented myself in an AAA national consumer arbitration hearing with AT&T Wireless, the retailer that sold me a BlackBerry cell phone with an FCC-required radiation safety warning that I didn't find for 8 months. The warning was not in the literature that accompanied my phone, but located in a file on a CD that came in the box. Prior to seeing the warning, I used the phone in an unsafe, and not compliant manner by making calls using an earpiece with the phone transmitting in my pocket directly against my body.

For the above reasons, I have taken the time to put together an amicus curiae brief in support of the City of San Francisco being allowed to enact the consumer cell phone "right to know" law. I have just recently become aware of the lawsuit filed against the City by the plaintiff, and ask that the court approve the inclusion of my late submission.

I have technical, FCC documents that I believe are relevant in the case to show that the industry is possibly engaging in deceptive marketing practices by failing to disclose an ALREADY FCC-required consumer safety warning that ALL manufacturers are required to warn users to never carry or use a cell phone directly against the body or the user will be exposed to radiation that exceeds maximum FCC safety guidelines. I have included copies of the FCC documents in my enclosed brief that show a requirement of consumers being warned about safe cell phone use regarding radiation exposure as a condition for every cell phone's FCC compliance.

This information is crucial in the case to demonstrate the current situation regarding the failure of cell phone providers to disclose existing FCC radiation safety warnings.

In my attached brief, I also include a simplified, "legal" discussion (in lay person's terms) of case law that may help argue against the plaintiff's claims of FCC federal preemption and 1st Amendment right violations.

No person or representative from either the plaintiff or defendant was involved in any aspect of the preparation of this amicus curiae brief. I am acting 100% on my own. I sent emails to the SF city attorneys today, April 7, 2011 notifying them of my intention to file this application; they were not involved in any way and I have never met with any staff member from the City of San Francisco, to date.

I respectfully submit this application to the court for acceptance of the enclosed amicus curiae brief.

Thank you,

Cynthia Franklin
520 Ridgeway Drive
Bellingham, WA 98225
360-201-3959  cwfranklin@aol.com

# United States District Court
# Northern District of California - San Francisco Division


RE:   CTIA - The Wireless Association,
                    Plaintiff
                    v.
      The City and County of San Francisco, California,
                    Defendant

Case #:  10 3224  WHA


# Brief of Amicus Curiae
April 8, 2011
(in support of Defendant)


In the Plaintiff's complaint, they argue that based on the First Amendment—"that private parties have the right not to speak and, in particular, not to have the government force them to endorse a controversial or false message."  The City of San Francisco is simply requiring cell phone providers to properly publicize a message that is already required to be disclosed to consumers by the FCC. Therefore, their claim that they are being required to endorse a "controversial or false message" is not accurate.  My basis for this statement follows.

Cell phone radiation for the 'SAR on the body' test is done with the cell phone held up to 1" away from the testing body/"phantom" in a holster.  Radiation is not tested with a cell phone positioned directly against the body (as in the manner in which many people use their phones, e.g.; in a pocket connected to an earpiece).  As stated on page 43 of the FCC document "Evaluating Compliance with FCC Guidelines for Human Exposure to RF Electromagnetic Fields" (see Appendix I-6), if a holster is not available, "A separation distance of 1.5 cm between the back of the device and a flat phantom is recommended for testing body-worn SAR compliance under such circumstances.  Other separation distances may be used, but they should not exceed 2.5 cm".  Note: 2.5 cm = 1".

Because cell phones are not tested directly against the body, but are allowed to be tested held up to 1" away to determine the highest radiation emission level, the FCC requires that consumers be warned to never use or wear their phone closer than this "separation distance" provided by a holster or they will be exposed to radiation that may exceed the federal limit.

This federal consumer radiation disclosure requirement is stated on page 43 of the FCC testing compliance document mentioned above (see Appendix I - 6), "In order for users to be aware of the body-worn operating requirements for meeting RF exposure compliance, operating instructions and caution statements should be included in the manual."

Also, every cell phone's application for compliance grant document, in the Grant Comments section, contains the same directive: "End users must be informed of the body-worn operating requirements for satisfying RF exposure compliance." (FCC/OET TCB Form 731 Grant of Equipment Authorization).

The plaintiff represents US cell phone manufacturers that engage in the practice of deceptively hiding these FCC-required consumer safety disclosures in technical language, printed in fine print and located in sections of the user guide where a consumer will rarely happen to see them.  To demonstrate this, I have attached samples of the manner in which the FCC-required consumer radiation safety warning is currently disclosed for cell phones from the industry's top 3 selling manufacturers' products:  1) RIM's BlackBerry, 2) Apple's iPhone, and 3) LG's Voyager.  (See Appendix II)

Appearing in Vol 12:159 "Journal of HealthCare Law and Policy" is an article that speaks to the issue of using the 1st amendment in compelled commercial speech cases.  As stated in the article's abstract:

> The Article analyzes First Amendment jurisprudence with regard to compelled speech and finds that the requirement to disclose factual commercial information receives less protection than government mandates to disclose facts or beliefs in other contexts. One value of commercial speech is an informed consumer population. The compelled disclosure of facts furthers this goal and underlies much of the consumer protection regulations in the United States.

The above-referenced article about compelled commercial speech (pages 171 - 178 of the journal) with relevant case law appears in Appendix III of this brief.  I'm not an attorney, but it seems clear that the consumer's right to know about an existing radiation safety warning legally trumps a corporation's right to not disclose the warning.

Carrying and using a cell phone in one's pocket is a typical way these products are used and yet many cell phones are likely to exceed the federal (FCC established) safety emission limit of 1.6 W/kg SAR when carried directly against the body.  It is a scientific fact using the inverse square law of physics, that a cell phone held directly against the body on a call exposes the user to as much as 16 times the radiation as when held 1" away from the body in a holster.  (1/4 inch vs. 1 inch)

In spite of being required to warn consumers, all manufacturers fail to do so in a manner that is apparent to the typical consumer, as shown with the three industry-leading manufacturers' samples mentioned above.

The Plaintiffs have a motive for deceiving consumers by hiding this existing FCC-required radiation safety warning (as well as to fight the Defendant's disclosure law): The fewer customers who hear about the danger of carrying or using cell phones directly against their bodies, the better for their bottom line.

Another deceptive marketing act by the manufacturers' represented by the Plaintiff is that the FCC maintains that a holster is required to safely carry a cell phone on the body. And, yet, holsters are rarely included with any cell phone product. In fact, consumers are charged up to an additional $30 to purchase the required holster, and manufacturers typically position the warning about requiring a holster for safe use in the manuals' fine print where it will not be seen by the typical user.

The CTIA argues that the City of San Francisco cannot mandate safety disclosures on the grounds of conflict preemption due to FCC federal regulation of these products. Murray v Motorola (2009), D. C. Court of Appeals, concludes that since 1996, the FCC has regulated cell phones for safe levels of radiation emission, and therefore occupies the field in this area *except in the case of deceptive marketing practices*. There is no federal preemption with respect to "material omissions", as in the case of "hiding" FCC-required consumer safety warnings that are crucial for safe operation of a cell phone. Requiring that this warning be displayed in a prominent location, in large enough type font for the typical consumer to see prior to use is not preempted by FCC regulatory authority.

Other court decisions that speak to the issue of deception by "hiding" safety warnings in "fine print":

Williams v. Gerber Products Company, (2008), U.S. Court of Appeals for the Ninth Circuit, finds that reasonable consumers should not be expected to look beyond misleading representations to discover the truth from the fine print located in a place not likely to be seen.

Panag v. Farmers, (2009), 166 Wn.2d 27, 47 – "A plaintiff need not show the act in question was intended to deceive, only that it had the capacity to deceive a substantial portion of the public."

Federal Trade Commission v. Cyberspace.com, LLC, (2006), 453 F.3d 1196, pages 6-8 – The Ninth Circuit held that fine print notices placed on the reverse side of a solicitation were insufficient as a matter of law, and found liability. In FTC v. Brown & Williamson Tobacco Corp., 250 US App. D.C. 162, 778 F.2d 35, 42-43 (D.C. Cir. 1985) "the D.C. Circuit affirmed a district court's finding that an advertisement's description of cigarette tar content was deceptive even though fine print in the corner of the advertisement truthfully explained how the tar content was measured. The court reasoned that, under the circumstances, consumers were unlikely to read the fine print in the corner of the ad."

Notice that in the iPhone's radiation safety warning to the user (Appendix II), the type size is barely legible. In the case of all BlackBerry cell phones, the safety warning does not even appear in the user guide at all! Instead, the user guide refers the user to read the file on a CD enclosed in the bottom of the box which includes a .pdf file that must be inserted into a computer and downloaded to enable a consumer to finally read the required radiation safety warning.

These 3 examples documented in Appendix II point to the industry's failure to make known to consumers the radiation safety information that the City of San Francisco seeks to disclose. The City's disclosure requirement is reasonably related to the goal of

informing consumers about safe usage and ways to avoid higher radiation exposure than allowed under FCC guidelines.

Therefore, the Defendant's consumer disclosure mandate IS constitutional and does not violate a cell phone provider's 1st Amendment right.

The City's disclosure law serves to avoid consumer confusion or deception (which is the case now as shown with the 3 sampled manufacturers' safety warnings). Without disclosure of the safety warning to never carry or use a cell phone in the typical manner in a pocket, for example, consumers will be deceived into believing this is a safe usage of the product. When, in fact, carrying or using a cell phone directly against the body is not deemed safe by the FCC and exposes the user to many times greater radiation than allowed by federal guidelines. Consumers have a right to know about safe ways to use their cell phones.

Thank you for considering the facts and opinions I have brought forth in this brief.

Respectfully submitted,

Cynthia Franklin
520 Ridgeway Drive
Bellingham, WA  98225
cwfranklin@aol.com



**Federal Communications Commission**
**Office of Engineering & Technology**

# Evaluating Compliance with FCC Guidelines for Human Exposure to Radiofrequency Electromagnetic Fields



*Additional Information for Evaluating Compliance of Mobile and Portable Devices with FCC Limits for Human Exposure to Radiofrequency Emissions*







## Supplement C
### *(Edition 01-01)*
### *to*
## OET Bulletin 65
### *(Edition 97-01)*

Appendix I

# Evaluating Compliance with FCC Guidelines for Human Exposure to Radiofrequency Electromagnetic Fields

## Additional Information for Evaluating Compliance of Mobile and Portable Devices with FCC Limits for Human Exposure to Radiofrequency Emissions

## SUPPLEMENT C
## Edition 01-01
### *to*
## OET BULLETIN 65
## Edition 97-01

### June 2001

### AUTHORS

David L. Means
Kwok W. Chan

Office of Engineering and Technology
Federal Communications Commission
Washington, D.C. 20554

I- 2

# *IMPORTANT NOTE*

This version of Supplement C supercedes the 97-01 edition and is issued in connection with the FCC's OET Bulletin 65, Version 97-01.  The information in this supplement provides additional guidance for use by applicants for FCC equipment authorization in evaluating mobile and portable devices for compliance with the FCC's guidelines for human exposure to radiofrequency (RF) electromagnetic fields.  Users of this supplement should also consult Bulletin 65 for complete information on FCC policies, guidelines and compliance-related issues concerning human exposure to RF fields.  OET Bulletin 65 can be viewed and downloaded from the FCC's Office of Engineering and Technology's World Wide Web Internet Site: http://www.fcc.gov/oet/.

I-3

## TABLE OF CONTENTS

INTRODUCTION ...................................................................................................................3

SECTION 1: FCC RULES FOR RF COMPLIANCE OF MOBILE AND PORTABLE DEVICES ......................5
MOBILE DEVICES ...............................................................................................................5
PORTABLE DEVICES............................................................................................................6
EXPOSURE CATEGORIES.......................................................................................................6
    OCCUPATIONAL / CONTROLLED EXPOSURE ...........................................................................6
    GENERAL POPULATION / UNCONTROLLED EXPOSURE ..............................................................6

SECTION 2: GUIDELINES FOR EVALUATING MOBILE AND PORTABLE DEVICES................................8
DETERMINATION OF DEVICE AND EXPOSURE CATEGORIES ............................................................8
MPE EVALUATION OF MOBILE DEVICES ..................................................................................9
SAR EVALUATION OF PORTABLE OR MOBILE DEVICES...............................................................10
    SAR EVALUATION TECHNIQUES.......................................................................................10
    HANDSET AND OTHER TRANSMITTER TEST POSITIONS ..........................................................11
    TISSUE MODELS..........................................................................................................12
SAR MEASUREMENT SYSTEM DESCRIPTIONS AND REQUIREMENTS ................................................13
DEVICE TEST CONDITIONS ..................................................................................................14
SAR MEASUREMENT PROCEDURES ........................................................................................15
SAR COMPUTATION GUIDELINES AND DESCRIPTIONS ................................................................15
MEASUREMENT AND COMPUTATIONAL UNCERTAINTIES ..............................................................17

SECTION 3: RF EXPOSURE COMPLIANCE FOR SPREAD SPECTRUM TRANSMITTERS ......................18
METHODS TO ENSURE COMPLIANCE FOR SPREAD SPECTRUM TRANSMITTERS ..................................19

REFERENCES.....................................................................................................................23

APPENDIX A: FCC EXPOSURE CRITERIA ................................................................................27
FCC LIMITS FOR MAXIMUM PERMISSIBLE EXPOSURE (MPE) ......................................................28
FCC LIMITS FOR SPECIFIC ABSORPTION RATE (SAR) ...............................................................29

APPENDIX B: INFORMATION FOR DOCUMENTING SAR COMPLIANCE................................................30
I: INFORMATION ON TEST DEVICE AND EXPOSURE CATEGORIES ....................................................31
II: SPECIFIC INFORMATION FOR SAR MEASUREMENTS................................................................32
III: SPECIFIC INFORMATION FOR SAR COMPUTATIONS................................................................34

APPENDIX C: TISSUE DIELECTRIC PARAMETERS .......................................................................36
TISSUE DIELECTRIC PARAMETERS FOR HEAD AND BODY PHANTOMS .............................................37
TYPICAL COMPOSITION OF INGREDIENTS FOR LIQUID TISSUE PHANTOMS .......................................38

APPENDIX D: SAR MEASUREMENT PROCEDURES .......................................................................39
PHANTOM CONSIDERATIONS .................................................................................................39
    RECOMMENDED CHARACTERISTICS OF HEAD AND BODY PHANTOMS...........................................40
    RECOMMENDED DEVICE TEST POSITIONS FOR TYPICAL WIRELESS HANDSET ..........................41
        DEVICES OPERATING NEXT TO A PERSON'S EAR..........................................................41
        RECOMMENDED TEST POSITIONS FOR BODY-WORN AND OTHER SIMILAR
        CONFIGURATIONS ....................................................................................................43
    DOCUMENTATION .......................................................................................................44
TISSUE DIELECTRIC PROPERTY REQUIREMENTS........................................................................45
ELECTRIC FIELD PROBE CHARACTERISTICS AND CALIBRATION .....................................................45

I-4

SYSTEM VERIFICATION .................................................................................................46
TEST SITE AMBIENT CONDITIONS................................................................................48
TEST DEVICE OPERATING CONDITIONS........................................................................48
    OUTPUT POWER.......................................................................................................49
    BATTERY OPTIONS ..................................................................................................49
    DEVICE OPERATING CAPABILITIES .........................................................................49
    DEVICE OPERATING MODES.....................................................................................49
    SOURCE-BASED TIME AVERAGING...........................................................................50
RECOMMENDED SAR MEASUREMENT PROCEDURES ...................................................50
    PROCEDURES TO SEARCH FOR PEAK SAR LOCATIONS ...........................................51
    PROCEDURES FOR DETERMINING ONE-GRAM AVERAGED SAR ...............................52
MEASUREMENT UNCERTAINTIES ..................................................................................53
    TYPES OF MEASUREMENT UNCERTAINTIES .............................................................53
    DETERMINING TOTAL SYSTEM MEASUREMENT UNCERTAINTY.................................54
        DOCUMENTING THE MEASUREMENT UNCERTAINTY OF SAR EVALUATIONS ...................56
        DOCUMENTING THE MEASUREMENT UNCERTAINTY FOR SAR SYSTEM VERIFICATION 57

I-5

**Recommended handset and head phantom test positions for *FCC compliance evaluation***

| Phantom Configurations | Device Test Positions | Antenna Position | SAR (W/kg) Device Test channel, Frequency & Output | | |
|---|---|---|---|---|---|
| | | | Channel: ___ ___ MHz ___ mW | Channel: ___ ___ MHz ___ mW | Channel: ___ ___ MHz ___ mW |
| Left Side of Head | Cheek / Touch | extended | | | |
| | | retracted | | | |
| | Ear / Tilt | extended | | | |
| | | retracted | | | |
| Right Side of Head | Cheek / Touch | extended | | | |
| | | retracted | | | |
| | Ear / Tilt | extended | | | |
| | | retracted | | | |

## RECOMMENDED TEST POSITIONS FOR BODY-WORN AND OTHER CONFIGURATIONS

Body-worn operating configurations should be tested with the belt-clips and holsters attached to the device and positioned against a flat phantom in normal use configurations. Devices with a headset output should be tested with a headset connected to the device. The body dielectric parameters specified in Appendix C should be used. Both the physical spacing to the body of the user as dictated by the accessory and the materials used in an accessory affect the SAR produced by the transmitting device. For purpose of determining test requirements, accessories may be divided into two categories: those that do not contain metallic components and those that do.

When multiple accessories that do not contain metallic components are supplied with the device, the device may be tested with only the accessory that dictates the closest spacing to the body. When multiple accessories that contain metallic components are supplied with the device, the device must be tested with each accessory that contains a unique metallic component. If multiple accessories share an identical metallic component (e.g., the same metallic belt-clip used with different holsters with no other metallic components), only the accessory that dictates the closest spacing to the body must be tested.

Body-worn accessories may not always be supplied or available as options for some devices that are intended to be authorized for body-worn use. A separation distance of 1.5 cm between the back of the device and a flat phantom is recommended for testing body-worn SAR compliance under such circumstances. Other separation distances may be used, but they should not exceed 2.5 cm. In these cases, the device may use body-worn accessories that provide a separation distance greater than that tested for the device provided however that the accessory contains no metallic components..

In order for users to be aware of the body-worn operating requirements for meeting RF exposure compliance, operating instructions and caution statements should be included in the manual. The information should allow users to make informed decisions on the type of body-worn accessories and operating configurations that are appropriate for the device. The following

I-6

*Apple iPhone*

*Actual first size of warning –*

*Apple iPhone*

*Appendix II*

*RIM Blackberry — (Safety information this required only appears on a .pdf file on a CD in the box) (file must be downloaded to view)*

**Stability:** Do not place the BlackBerry device or device accessory on any unstable surface. It could fall, thereby potentially causing serious injury to a person and serious damage to the BlackBerry device or device accessory. Take care when using the BlackBerry device with any charging accessories to route the power cord in a way that reduces the risk of injury to others, such as by tripping or choking.

**Cleaning:** Do not use liquid, aerosol cleaners, or solvents on or near the BlackBerry device or device accessory. Clean only with a soft dry cloth. Disconnect any cables from the computer and unplug any charging accessories from the electrical outlet before cleaning either the BlackBerry device or the charging accessory.

**Repetitive strain:** When using the BlackBerry device, take frequent breaks. If you experience any discomfort in your neck, shoulders, arms, wrists, hands (including thumbs and fingers), or other parts of the body when using the BlackBerry device, cease use immediately. If discomfort persists, consult a physician.

**Holster:** The BlackBerry device might not come with a holster (body-worn accessory). If you wear the BlackBerry device on your body, always put the BlackBerry device in a BlackBerry device holster equipped with an integrated belt clip supplied or approved by Research In Motion. If you do not use a holster equipped with an integrated belt clip supplied or approved by RIM when you carry the BlackBerry device, keep the BlackBerry device at least 0.98 inches (25 mm) from your body when the BlackBerry device is turned on and connected to a wireless network. When using any data feature of the BlackBerry device, with or without a USB cable, hold the BlackBerry device at least 0.98 inches (25 mm) from your body. Using accessories that are not supplied or approved by RIM might cause your BlackBerry device to exceed radio frequency (RF) exposure guidelines. For more information on radio frequency exposure, see the "Compliance information" section of this document.

15

*II-2*

**Carrying solutions:** Most BlackBerry carrying solutions for BlackBerry devices, for example holsters, totes, and pouches, incorporate a magnet into the physical structure of the carrying solution. Do not place items containing magnetic strip components such as debit cards, credit cards, hotel key cards, phone cards, or similar items near BlackBerry carrying solutions which incorporate a magnet into the physical structure of the carrying solution as the magnet might damage or erase the data stored on the magnetic strip.

# Compliance information

## Exposure to radio frequency signals

The BlackBerry® device radio is a low power radio transmitter and receiver. When the BlackBerry device radio is turned on, it receives and also sends out radio frequency (RF) signals. The BlackBerry device is designed to comply with Federal Communications Commission (FCC), Ministry of Internal Affairs and Communications (MIC), and Industry Canada (IC) guidelines respecting safety levels of RF exposure for wireless devices, which in turn are consistent with the following safety standards previously set by Canadian, U.S., and international standards bodies:

- ANSI/IEEE C95.1, 1999, American National Standards Institute/Institute of Electrical and Electronics Engineers Standard for Safety Levels with Respect to Human Exposure to Radio Frequency Electromagnetic Fields, 3 kHz to 300 GHz
- National Council on Radiation Protection and Measurements (NCRP) Report 86, 1986, Biological Effects and Exposure Criteria for Radiofrequency Electromagnetic Fields

II -3

- Health Canada, Safety Code 6, 1999, Limits of Human Exposure to Radiofrequency Electromagnetic Fields in the Frequency Range from 3 kHz to 300 GHz
- International Commission on Non-Ionizing Radiation Protection (ICNIRP), 1998, Guidelines for Limiting Exposure to Time-Varying Electric, Magnetic, and Electromagnetic fields (up to 300 GHz)
- MIC, 2001, Article 14-2 of the Ordinance for Regulating Radio Equipment

To maintain compliance with FCC and IC RF exposure guidelines when you carry the BlackBerry device on your body, use only accessories equipped with an integrated belt clip that are supplied or approved by Research In Motion (RIM), or accessories that contain no metallic components and provide a separation distance from the body of at least 0.98 inches (25 mm). Use of accessories that are not expressly approved by RIM might violate FCC and IC RF exposure guidelines and might void any warranty applicable to the BlackBerry device. If you do not use a body-worn accessory equipped with an integrated belt clip supplied or approved by RIM when you carry the BlackBerry device, keep the BlackBerry device at least 0.98 inches (25 mm) from your body when the BlackBerry device is turned on and connected to a wireless network. When using any data feature of the BlackBerry device, with or without a USB cable, hold the BlackBerry device at least 0.98 inches (25 mm) from your body. If you use a body-worn accessory not supplied by RIM when you carry the BlackBerry device, verify that the accessory does not contain metal and keep the BlackBerry device at least 0.98 inches (25 mm) from your body when the BlackBerry device is turned on and connected to a wireless network.

## Specific absorption rate data

THIS WIRELESS DEVICE MODEL MEETS GOVERNMENT REQUIREMENTS FOR EXPOSURE TO RADIO WAVES.

II-4

absorption of RF energy by the human body expressed in units of watts per kilogram (W/kg). The FCC requires wireless phones to comply with a safety limit of 1.6 watts per kilogram (1.6 W/kg). The FCC exposure limit incorporates a substantial margin of safety to give additional protection to the public and to account for any variations in measurements.

Tests for SAR are conducted using standard operating positions specified by the FCC with the phone transmitting at its highest certified power level in all tested frequency bands. Although SAR is determined at the highest certified power level, the actual SAR level of the phone while operating can be well below the maximum value. Because the phone is designed to operate at multiple power levels to use only the power required to reach the network, in general, the closer you are to a wireless base station antenna, the lower the power output.

Before a phone model is available for sale to the public, it must be tested and certified to the FCC that it does not exceed the limit established by the government-adopted requirement for safe exposure.

The tests are performed in positions and locations (e.g., at the ear and worn on the body as required by the FCC for each model. This device was tested for typical body-worn operations with the back of the phone kept 0.79 inches (2.0 cm) between the user's body and the back of the phone. To comply with FCC RF exposure requirements, a minimum separation distance of 0.79 inches (2.0 cm) must be maintained between the user's body and the back of the phone. Third-party belt-clips, holsters, and similar accessories containing metallic components should not be used. Body-worn accessories that cannot maintain 0.79 inches (2.0 cm) separation distance between the user's body and the back of the phone, and have not been tested for typical body-worn operations may not comply with FCC RF exposure limits and should be avoided.

The FCC has granted an Equipment Authorization for this model phone with all reported SAR levels evaluated as in compliance with the FCC RF emission guidelines. The highest SAR value for this model phone when tested for use at

*In the United States and Canada, the SAR limit for mobile phones used by the public is 1.6 watts/kg (W/kg) averaged over one gram of tissue. The standard incorporates a substantial margin of safety to give additional protection to the public and to account for any variations in measurements.

the ear is 0.765 W/kg and when worn on the body, as described in this user's manual, is 0.833 W/kg. While there may be differences between SAR levels of various phones and at various positions, they all meet the government requirement for safe exposure.

SAR information on this model phone is on file with the FCC and can be found under the Display Grant section of http://www.fcc.gov/oet/fccid after searching on FCC ID.

To find information that pertains to a particular model phone, this site uses the phone FCC ID number which is usually printed somewhere on the case of the phone. Sometimes it may be necessary to remove the battery pack to find the number. Once you have the FCC ID number for a particular phone, follow the instructions on the website and it should provide values for typical or maximum SAR for a particular phone.

Additional information on Specific Absorption Rates (SAR) can be found on the Cellular Telecommunications Industry Association (CTIA) website at http://www.ctia.org/

### FCC Hearing-Aid Compatibility (HAC) Regulations for Wireless Devices

On July 10, 2003, the U.S. Federal Communications Commission (FCC) Report and Order in WT Docket 01-309 modified the exception of wireless phones under the Hearing Aid Compatibility Act of 1988 (HAC Act) to require digital wireless phones be compatible with hearing-aids. The intent of the HAC Act is to ensure reasonable access to telecommunications services for persons with hearing disabilities. While some wireless phones are used near some hearing devices (hearing aids and cochlear implants), users may detect a buzzing, humming, or whining noise. Some hearing devices are more

The following pages are from an article in Vol 12:159 "Journal of HealthCare Law and Policy" that addresses the issue of using the 1st amendment as related to commercial speech. Stated in the article's abstract:

"The Article analyzes First Amendment jurisprudence with regard to compelled speech and finds that the requirement to disclose factual commercial information receives less protection than government mandates to disclose facts or beliefs in other contexts. One value of commercial speech is an informed consumer population. The compelled disclosure of facts furthers this goal and underlies much of the consumer protection regulations in the United States."

III. FIRST AMENDMENT ANALYSIS OF COMPELLED SPEECH
2009] COMPELLED SPEECH UNDER THE COMMERCIAL SPEECH DOCTRINE     173

*B. Commercial Speech*

First Amendment protection is not as broad in the context of commercial speech. In the seminal case of *Virginia Pharmacy*, the Court explained that the "hardiness of commercial speech" may "make it appropriate to require that a commercial message appear in such a form, or include such additional information, warnings, and disclaimers, as are necessary to prevent its being deceptive."112 Since then, the first case analyzing such a commercial speech mandate was *Zauderer v. Office of Disciplinary Counsel of the Supreme Court of Ohio*.113
In *Zauderer*, the Court considered a state requirement that attorney advertisements for contingent-fee representation disclose whether percentages were computed before or after deduction of court costs and expenses because the "failure to inform clients that they would be liable for costs (as opposed to legal fees) even if their claims were unsuccessful rendered the advertisement 'deceptive.'"114 The Ohio Office of Disciplinary Counsel filed a complaint against attorney Zauderer for, among other things, failing to comply with this disclosure requirement.115 The Court made it clear that, although the compulsion to speak can violate the First Amendment in the realm of traditional speech, this is not the case in the commercial speech arena because:

109. *Riley*, 487 U.S. at 796. 110. *Id.* at 797–98. 111. *Id.* at 795, 803. 112. Va. State Bd. of Pharmacy v. Va. Citizens Consumer Council, Inc., 425 U.S. 748, 772 n.24
(1976). 113. 471 U.S. 626 (1985). The Court addressed commercial speech mandates several decades before *Virginia State Board of Pharmacy*, but it was not recognized as a commercial speech case at the time. *See, e.g.*, Abood v. Detroit Bd. of Educ., 431 U.S. 209, 234–35 (1977) (considering whether compelled monetary contributions to political causes by members of a union violated the First Amendment); *Riley*, 487 U.S. at 796–98 (determining that when generally commercial speech is intertwined with other protected speech elements, the Court's test for fully protected expression must apply).
114. 471 U.S. at 633, 632 n.4. 115. *Id.* at 631–33.

Appendix III

The interests at stake in this case are not of the same order as those discussed in *Wooley, Tornillo,* and *Barnette.* Ohio has not attempted to "prescribe what shall be orthodox in politics, nationalism, religion, or other matters of opinion or force citizens to confess by word or act their faith therein." The State has attempted only to prescribe what shall be orthodox in commercial advertising, and its prescription has taken the form of a requirement that appellant include in his advertising purely factual and uncontroversial information about the terms under which his services will be available.116

Therefore, the Court held that the factual disclosure requirement should neither be analyzed under the strict scrutiny test reserved for restrictions or compulsions of traditional speech, nor should it be analyzed under the intermediate test for restrictions of commercial speech under *Central Hudson.*117 The requirement to disclose factual commercial information was instead analyzed under the most lenient constitutional test: the reasonable relationship test.118 Under the reasonable relationship test, the Court looked at whether the regulation bore a reasonable relationship to the government's stated interest in passing the regulation, and as such, the mandate at issue was found to be constitutional.119

It is noteworthy that the *Riley* Court differentiated *Zauderer* from the charitable solicitation case by saying, "[p]urely commercial speech is more susceptible to compelled disclosure requirements."120 Unlike the factual disclosure requirements at issue in *Riley,* factual disclosure requirements in the commercial speech arena must only meet the reasonable relationship test. One reason for this is the purpose of the reduced protection for commercial speech and the value such information has in the commercial marketplace.121 In *Central Hudson,* the Court explained:

In most other contexts, the *First Amendment* prohibits regulation based on the content of the message. Two features of commercial speech permit regulation of its content. First, commercial speakers have extensive knowledge of both the market and their products. Thus, they are well situated to evaluate the accuracy of their messages and the

116. *Id.* at 651 (quoting W. Va. State Bd. of Educ. v. Barnette, 319 U.S. 624, 642 (1943)).
117. *Id.* ("[W]e hold that an advertiser's rights are adequately protected as long as disclosure requirements are *reasonably related* to the State's interest in preventing deception of consumers.") (emphasis added); *see also supra* notes 79–82 and accompanying text (discussing strict scrutiny in the realm of commercial speech); *supra* notes 88–92 and accompanying text (discussing the *Central Hudson* intermediate test).
118. *See id.*; *see also* Recent Development, *Attorney Advertising and Commercial Speech After* Zauderer v. Office of Disciplinary Counsel, 21 TULSA L.J. 591, 602–03 (1986) (explaining how the holding in *Zauderer* established a more lenient First Amendment test).
119. *Zauderer,* 471 U.S. at 651–53. 120. Riley v. Nat'l Fed'n of the Blind, 487 U.S. 781, 796 n.9 (citing *Zauderer,* 471 U.S. 626 (1985)). 121. *See* Nat'l Elec. Mfrs. Ass'n v. Sorrell, 272 F.3d 104, 113 (2d Cir. 2001); *see also Zauderer,* 471 U.S. at 651.

lawfulness of the underlying activity. In addition, commercial speech, the offspring of economic self-interest, is a hardy breed of expression that is not "particularly susceptible to being crushed by overbroad regulation."122

Because the commercial speaker has access to the facts regarding their products and services, inaccurate statements of fact are not protected by the First Amendment and the disclosure of accurate factual information may be compelled. In *Zauderer*, the Court explained that because "the extension of First Amendment protection to commercial speech is justified principally by the value to consumers of the information such speech provides," the commercial actor's "constitutionally protected interest in *not* providing any particular factual information in his advertising is minimal."123 This is why the State may require a commercial actor "to provide somewhat more information than they might otherwise be inclined to present."124

In the case of *NYSRA v. NYC Board of Health*, the restaurant industry argued that *Zauderer*'s reasonable relationship test was limited to preventing consumer confusion or deception.125 Although menu label laws and other disclosure requirements do prevent consumer confusion or deception because the absence of such information can make the sale of the target product misleading,126 NYSRA's argument is a misinterpretation of *Zauderer*. This reading incorrectly collapses the analysis of the first prong of the *Central Hudson* test with the reasonable relationship test applicable to commercial disclosure requirements.

In *Zauderer*, the Court's language announcing its holding led to the NYSRA's misunderstanding of the import of the case. Specifically, the Court held that although "unjustified or unduly burdensome disclosure requirements might offend the First Amendment by chilling protected commercial speech… an advertiser's rights are adequately protected as long as disclosure requirements are reasonably related to the State's interest in preventing deception of consumers."127

122. Cent. Hudson Gas & Elec. Corp. v. Pub. Serv. Comm'n, 447 U.S. 557, 564 n.6 (1980) (citations omitted).
123. 471 U.S. at 651 (citation omitted). 124. *Id.* at 650. 125. *See* Reply Memorandum in Support of Motion for Preliminary Injunction, Declaratory Relief
and Partial Summary Judgment at 22–23, 33, 36–38, N.Y. State Rest. Ass'n v. N.Y. City Bd. of Health, 509 F. Supp. 2d 351 (S.D.N.Y. 2007) (No. c-05710).
126. *See generally* Burton et al., *supra* note 27, at 1674 ("[T]he provision of easily accessible nutrition information may provide significant public health benefits by making it easier for consumers to make more healthful food choices."); Jennifer L. Pomeranz & Kelly D. Brownell, *Legal and Public Health Considerations Affecting the Success, Reach, and Impact of Menu-Labeling Laws*, 98 AM. J. PUB. HEALTH 1578, 1579 (2008) ("Menu labels provide one tool for customers to make more-informed decisions and reduce the current confusion over portion sizes and the calorie and nutrition content of restaurant food.").
127. *Zauderer*, 471 U.S. at 651.

Stating it another way, the Court explained that "because disclosure requirements trench much more narrowly on an advertiser's interests than do flat prohibitions on speech, '[warnings] or [disclaimers] might be appropriately required . . . in order to dissipate the possibility of consumer confusion or deception.'"128 Due to these statements, *Zauderer* was misinterpreted by the NYSRA to mean that only these state interests (preventing consumer confusion or deception) are viable to support a factual disclosure requirement.129 Rather than addressing consumer confusion or governmental interests, *Zauderer* analyzed whether the State could compel speech through commercial disclosure requirements.130 If a menu label law is considered a routine factual disclosure requirement,131 then *Zauderer*'s reasonable relationship test must control the analysis of whether the government's stated interest is reasonably related to the institution of such a law. The correct reading of the passages above is that in *Zauderer*, the disclosure requirement was reasonably related to the government's interest in that case: avoiding misleading voluntary advertisements by attorneys. In *Virginia Pharmacy*, the Court foresaw the potential for confusing or deceptive advertising by certain professionals:

We stress that we have considered in this case the regulation of commercial advertising by pharmacists. Although we express no opinion as to other professions, the distinctions, historical and functional, between professions, may require consideration of quite different factors. Physicians and lawyers, for example, do not dispense standardized products; they render professional *services* of almost infinite variety and nature, with the consequent enhanced possibility for confusion and deception if they were to undertake certain kinds of advertising.132

The fact that *Zauderer*'s disclosure requirement was validated for this reason reflects the Court's special concern for the possibility of deception in the realm of professional advertisement. In *Bates v. State Bar of Arizona*, a case involving attorney advertising, the Court made a similar statement: "We do not foreclose the possibility that some limited supplementation, by way of warning or disclaimer or the like might be required of even an advertisement of the kind ruled upon today so as to assure that the consumer is not misled."133

The Supreme Court has paid particular attention to speech in the professional advertisement context. The Court has explained that "advertising by the professions

128. *Id.* (quoting *In re* R. M. J., 455 U.S. 191, 201 (1982)). 129. *See* Reply Memorandum, *supra* note 125, at 22–23, 33, 35–38. 130. *Zauderer*, 471 U.S. at 627. 131. *See infra* Part V. 132. Va. State Bd. of Pharmacy v. Va. Citizens Consumer Council, Inc., 425 U.S. 748, 773 n.25 (1976) (emphasis in original). 133. 433 U.S. 350, 384 (1977).

poses special risks of deception—'because the public lacks sophistication concerning legal services, misstatements that might be overlooked or deemed unimportant in other advertising may be found quite inappropriate in legal advertising.'"134 Thus, in the professional advertising context, courts often talk in terms of inherently misleading speech, which is not protected by the First Amendment and can be prohibited entirely.135 In *Zauderer*, the Court spoke of the omission in terms reminiscent of "inherently misleading" professional advertising cases:

The assumption that substantial numbers of potential clients would be so misled is hardly a speculative one: it is a commonplace that members of the public are often unaware of the technical meanings of such terms as "fees" and "costs"—terms that, in ordinary usage, might well be virtually interchangeable. When the possibility of deception is as self- evident as it is in this case, we need not require the State to "conduct a survey of    the . . .    public       before

it       [may] determine    that    the [advertisement] had a tendency to mislead." The State's position that it is deceptive to employ advertising that refers to contingent-fee arrangements without mentioning the client's liability for costs is reasonable enough to support a requirement that information regarding the client's liability for costs be disclosed.136

However, by definition, inherently misleading speech cannot be cured by disclosure requirements. *Zauderer* is not a case about curing misleading speech, but rather a case about the constitutionality of a disclosure requirement.137 Thus, the Court did not need to consider which type of misleading speech the statute was designed to cure; rather, it only needed to determine whether the disclosure requirement was reasonably related to the state's goal.138

The NYSRA's reading would place *Zauderer* in the context of the first prong of the *Central Hudson* test, which requires courts to ask whether the speech is protected by the First Amendment, meaning it is not misleading or about unlawful activity.139 There is a clear distinction between mandating the disclosure of commercial facts and curing potentially misleading speech. The former is

134. *In re* R. M. J., 455 U.S 191, 200 (1982) (quoting *Bates*, 433 U.S. at 383).
135. *Id.* at 203 ("[W]hen the particular content or method of the advertising suggests that it is inherently misleading . . . , the States may impose appropriate restrictions [and it] may be prohibited entirely.").
136. Zauderer v. Office of Disciplinary Counsel, 471 U.S. 626, 652–53 (1985) (quoting Fed. Trade Comm'n v. Colgate-Palmolive Co., 380 U.S. 374, 391–92 (1965)).
137. *See id.* at 629. 138. *Id.* at 651. 139. Cent. Hudson Gas & Elec. Corp. v. Pub. Serv. Comm'n, 447 U.S. 557, 564 (1980).

commonplace in the current consumer protection regulatory scheme in the U.S.140 The latter is a judicial cure for potentially misleading speech.141

It also cannot be that all compelled disclosure requirements must be reasonably related to only one government interest—that of avoiding consumer confusion or deception. This reading would mean that the type of speech determines whether the government interest is constitutional. This is not a logical reading as it is for the government entity to define its interest and not the law to tailor a particular interest to be had.142 Further, as explored below, labels on food, beverage and textile products are a form of commercial speech that put more information in the commercial marketplace because the absence of this information can be confusing, deceptive, or just plain incomplete. United States Courts of Appeal that have considered this argument have interpreted *Zauderer* as applying to compelled disclosure requirements enacted for other purposes.143 The result of the NYSRA's argument would be that all commercial disclosure requirements are constitutionally suspect. This is not only incorrect, but unfeasible.144

---

140. *See infra* Part IV.

141. Peel v. Attorney Registration & Disciplinary Comm'n, 496 U.S. 91, 110 (1990) ("To the extent that potentially misleading statements of private certification or specialization could confuse consumers, a State might consider screening certifying organizations or requiring a disclaimer about the certifying organization or the standards of a specialty. A State may not, however, completely ban statements that are not actually or inherently misleading . . . .") (citation omitted).

142. *See, e.g.*, Ward v. Rock Against Racism, 491 U.S. 781, 791 (1989) (explaining how "[t]he government's purpose is the controlling consideration").

143. *See infra* notes 211–229 and accompanying text.

144. *See, e.g.*, Nat'l Elec. Mfrs. Ass'n v. Sorrell, 272 F.3d 104, 116 (2d Cir. 2001) (noting that "[t]he right of a commercial speaker not to divulge accurate information regarding his services is not such a fundamental right").

Sender: Please seal before shipping.

Align top of FedEx Express Shipping Label here.

PRIORITY OVERNIGHT
94102
CA–US   SF

82 SFOA

**FedEx**
Express

NEW Package
US Airbill

1 From
Date April 8, '11
Sender's Name Cynthia Franklin   Phone 360 201-3959
Company
Address 520 Rudagway Dr.
City Bellingham   State WA   ZIP 98225

2 Your Internal Billing Reference

3 To
Recipient's Name U.S. District Court
Company 450 Golden Gate Avenue
City San Francisco   State CA   ZIP 94102

8758 3386 0869

FedEx Retrieval Copy

fedex.com 1.800.GoFedEx 1.800.463.3339