Robert A. Mittelstaedt (#60359)
Craig E. Stewart (#129530)
JONES DAY
555 California Street
26th Floor
San Francisco, CA  94104
Telephone:  (415) 626-3939
Fax:  (415) 875-5700
ramittelstaedt@jonesday.com

Andrew G. McBride (pro hac vice)
Joshua S. Turner (pro hac vice)
Megan L. Brown
Brendan T. Carr
WILEY REIN LLP
1776 K Street, N.W.
Washington, DC  20006
Telephone:  (202)719-7000
Fax:  (202) 719-7049
amcbride@wileyrein.com

Jane F. Thorpe (pro hac vice)
Scott A. Elder (pro hac vice)
ALSTON & BIRD LLP
1201 West Peachtree St., N.W.
Atlanta, Georgia  30309-3424
Telephone: (404) 881-7592
Fax: (404) 253-8875
jane.thorpe@alston.com

Seamus C. Duffy (pro hac vice)
Susan M. Roach (pro hac vice)
DRINKER BIDDLE & REATH LLP
One Logan Square
Suite 2000
Philadelphia, PA  19103-6996
Telephone:  (215) 988-2700
Fax:  (215) 988-2757
seamus.duffy@dbr.com

Terrence J. Dee (pro hac vice)
KIRKLAND & ELLIS LLP
300 North LaSalle
Chicago, IL  60654
Telephone:  (312) 862-2099
Fax:  (312) 862-2200
tdee@kirkland.com

Attorneys for Plaintiff
CTIA – The Wireless Association®

UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF CALIFORNIA
SAN FRANCISCO DIVISION

| | |
|---|---|
| CTIA - THE WIRELESS ASSOCIATION®,<br><br>Plaintiff,<br><br>v.<br><br>THE CITY AND COUNTY OF SAN FRANCISCO, CALIFORNIA,<br><br>Defendant. | Case No. 3:10-cv-03224 WHA<br><br>**PLAINTIFF'S MEMORANDUM IN RESPONSE TO THE COURT'S NOTICE REQUESTING ADDITIONAL INFORMATION**<br><br>Date:     October 20, 2011<br>Time:    8:00 a.m.<br>Place:    Courtroom 9, 19th Floor |

**INTRODUCTION**

Plaintiff CTIA—The Wireless Association® ("CTIA") respectfully submits this memorandum in response to the Court's Notice Requesting Additional Information ("Notice"). *See* Dkt. No. 80.  The Notice asks CTIA to (1) address whether *Carrico v. City and County of San Francisco*, No. 09-17151, 2011 WL 3890748 (9th Cir. Sept. 6, 2011), applies to the facts as pled here, *id.*; *see also* Dkt. No. 79; and (2) identify all express findings by the FCC that cell phones are safe for human use, Dkt. No. 80.

**I.     *CARRICO* CONFIRMS THAT CTIA HAS STANDING.**

The holding in *Carrico* is not applicable to the standing inquiry in this case.  The key point is that in *Carrico* an entirely voluntary action stood between the landlords and any punishment for expressive conduct.  No landlord was willing to aver that he or she intended to engage in the kind of "threats or intimidation" proscribed by Proposition M.  In contrast, the Ordinance at issue here compels speech for every "cell phone retailer" within the confines of the City.  On October 25, 2011, all "cell phone retailers" will have to disseminate a message chosen by the City or face a $500 fine per violation.  Ordinance §§ 1103, 1105.  Thus, unlike *Carrico* the "status" of being a vendor of cell phones is enough, standing alone, to trigger a burden on an undisputed First Amendment interest in editorial control over the messages conveyed by "posters," "call-out cards," and "factsheets" in private retail outlets.

In fact, in the context of the motion for a preliminary injunction, CTIA has gone far beyond the requirement to simply plead First Amendment injury and has laid out by declaration the disruption of its members' editorial control over their stores, the critically important nature of speech at the point of sale, and even the fact that some private speech must give way (particularly on the space-constrained "call out cards") for City-mandated speech. *See* Dkt. No. 55 ¶ 26 (Declaration of Domenico D'Ambrosio, Verizon Wireless, In Support of Motion for a Preliminary Injunction).  For the reasons discussed below, like most compelled speech cases (which *Carrico* was not) being in the targeted group for disseminating the government's message *ipso facto* confers standing.

*First*, the legal regimes at issue in *Carrico* and here are fundamentally different, in ways that underscore the acute and irreparable nature of First Amendment intrusion in this case. In *Carrico*, an association of landlords and an individual landlord brought a First Amendment challenge to "Proposition M," which amended San Francisco's rent-stabilization ordinance. Proposition M prohibited landlords from engaging in a particular type of activity—namely, "from attempting, 'in bad faith,' to 'coerce the tenant to vacate with offers of payments to vacate which are accompanied with threats or intimidation.'" *Carrico*, 2011 WL 3890748, *1 (quoting S.F. Admin. Code § 37.10B(a)(6)). The alleged burden on speech at issue in that case impacted only those landlords who might elect to act in bad faith and threaten and intimidate their tenants.

The *Carrico* plaintiffs argued that they had standing simply because they were landlords, or represented landlords, who were "subject to" Proposition M. *Id.* *3-4. The Ninth Circuit rejected this broad "subject to" view of standing in that particular context. The court explained that "Proposition M does not apply based solely on the status of landlord or tenant. Rather, [in order to apply] it requires a landlord to *do* something—to attempt, through 'threats or intimidation,' to 'coerce the tenant to vacate with offers of payments to vacate.'" *Id.* *4. The court held that it was pure speculation whether any of the landlords were planning to do what the state proscribed. *Id.*

Unlike Proposition M, the City's regime in this case imposes mandatory obligations on all cell phone retailers, not simply those who act in bad faith or take other actions that retailers may choose not to take in the ordinary course. Beginning October 25, 2011, all cell phone retailers in San Francisco must begin posting and disseminating City-drafted Posters, Factsheets, and Stickers in order to continue offering cell phones for sale. Unlike the association members in *Carrico*, CTIA's members face a stark choice: In order to continue selling cell phones in San Francisco, they must either comply with the Ordinance and have their First Amendment rights violated for the reasons set forth in CTIA's preliminary injunction motion, or fail to comply and be in violation of City law and subject to fines up to $500.00 per violation. Ordinance § 1105(b). It is this Hobson's choice, created by the

Ordinance that establishes the predicate for both standing and preliminary relief. *Accord Video Software Dealers Ass'n v. Schwarzenegger*, 401 F.Supp.2d 1034 (N.D. Cal. 2005) (Whyte, J.) (granting two associations of video game providers preliminary injunction against labeling requirement about to go into effect).

*Second*, unlike the *Carrico* plaintiffs, CTIA has made specific factual allegations that its members face an imminent and very real obligation to comply with the Ordinance. CTIA has alleged that it represents cell phone retailers who will be directly regulated by the Ordinance.[1] Indeed, CTIA has specifically identified three of its members who operate retail outlets in the City and who will be obligated by the Ordinance to post the City's Display Materials should the Ordinance take effect as scheduled.[2] As noted above, CTIA has also gone beyond the pleading stage and submitted declarations under oath in support of its motion for preliminary injunction, which show that its members are going to be directly affected by the Ordinance.[3] CTIA has also adequately alleged that its members' rights will be violated on

---

[1] *See* CTIA's Second Am. Compl. ("SAC") ¶ 13 ("Plaintiff CTIA—The Wireless Association® ('CTIA') is a District of Columbia not for profit corporation with its principal place of business in Washington, D.C. CTIA represents all sectors of the wireless industry, including but not limited to manufacturers of cell phones and accessories, providers of wireless services, and sellers of wireless services, handsets and accessories, which are affected by and subject to the challenged Ordinance, implementing regulations, and Display Materials.").

[2] SAC ¶ 14 ("Numerous of Plaintiff's members are 'cell phone retailers' under the Ordinance and would otherwise be subject to all the requirements of the Ordinance, implementing regulations, and Display Materials. For example, Verizon Wireless, AT&T, and T-Mobile USA are members of CTIA and they operate many retail outlets in the City that will be subject to the requirements of the Ordinance, implementing regulations, and Display Materials.").

[3] Dkt. No. 55 ¶ 3 (Declaration of Domenico D'Ambrosio, Verizon Wireless, In Support of Motion for a Preliminary Injunction) ("Verizon Wireless will be regulated by the City of San Francisco's 'Cell Phone Right to Know' Ordinance, . . . if it is allowed to go into effect."); *id.* ¶ 7 (identifying retail activities in San Francisco); *id.* ¶ 13 ("Verizon Wireless owns and operates five branded retail stores" in San Francisco, and sells through other channels like Walgreens); *id.* ¶ 29 (the Display Materials would "effectively force Verizon Wireless to disparage its own products and services, and thus would conflict with the messages that Verizon Wireless seeks to convey in its marketing materials"); *id.* ¶ 30 ("Enforcement . . . will be disruptive to Verizon Wireless's marketing sales, training and general business operations, and will impose costs and disruption. Compliance will require the creation and dissemination of appropriate revised display materials[.]"); *see also* Dkt. No. 56 ¶ 1 (Declaration of Cliff Fitterer, AT&T Mobility LLC, In Support of Motion for a Preliminary Injunction) (noting AT&T Mobility LLC operations in Northern California).

October 25 if the Ordinance is not enjoined,[4] and CTIA has demonstrated the immediacy of the enforcement obligations.[5]  Indeed, the City's Ordinance, and its own statements, confirm the imminence and likelihood of Article III injury to CTIA members.[6]

These allegations (and unrebutted facts in individual retailers' declarations) are more than enough to satisfy Article III's standing requirement.  As *Carrico* recognizes, the injury-in-fact requirement is satisfied where a plaintiff demonstrates an "'actual or imminent, not conjectural or hypothetical'" invasion of a legally protected interest.  *Carrico*, 2011 WL 3890748 *2 (quoting *Lujan v. Defenders of Wildlife*, 504 U.S. 555, 560 (1992)).  There are no conditions precedent to the forced-speech mandate at issue here—unless CTIA members just go out of business, they face certain consequences less than a week from now.

---

[4] SAC ¶ 112  ("The Ordinance and Display Materials violate the Free Speech Clause because they compel Plaintiff's members to speak on a topic selected by the City and require them to do so in  a manner prescribed by the City."); SAC ¶ 113 ("The Ordinance and Display Materials violate the First Amendment by forcing Plaintiff's members to disseminate messages and information that are inaccurate, misleading, controversial, unnecessarily alarmist, and with which Plaintiff's members disagree."); SAC ¶ 117 ("The Ordinance and Display Materials require Plaintiff's members to use their property to convey the City's messages."); SAC ¶ 118 ("The Ordinance and Display Materials require Plaintiff's members to convey the City's messages as if they were Plaintiff's members' own."); SAC ¶ 119 ("The Ordinance and Display Materials prescribe the precise font, size, method, and location for delivery of the messages mandated by the City.").

[5] *See, e.g.*, SAC ¶ 105. ("The City states on its website that the compliance deadline will be October 25 for the Poster and Factsheet and October 30 for the Statements."); SAC ¶ 106 ("Violations of the Ordinance or the regulations promulgated thereunder are punishable by administrative fines ranging up to $500.00 per violation. Ordinance, § 1105(b) & (d)."); SAC ¶ 107 ("Enforcement of the City's regime is imminent and will cause direct and irreparable harm to Plaintiff and its members.").

[6] *See* Ordinance § 1103(a) ("Beginning 15 days after the Department of the Environment adopts the regulations required under Section 1104(d), cell phone retailers must display in a prominent location visible to the public, within the retail store, an informational poster developed by the Department of the Environment as referenced in Section 1104."); *id.* § 1103(b) ("Beginning 15 days after the Department of the Environment adopts the regulations required under Section 1104(d), cell phone retailers must provide to every customer that purchases a cell phone a free copy of an informational factsheet developed by the Department of the Environment as referenced in Section 1104."); *see also* San Francisco, Department of the Environment, *Cell Phone Radiation* ("Compliance date for poster and factsheet: October 25th 2011") (http://www.sfenvironment.org/our_programs/interests.html?ssi=2&ti=3&ii=250); *see also* E-mail from Caitlin Sanders, San Francisco Department of the Environment (Sept. 30, 2011) ("Starting in October, SFEnvironment staff will conduct extensive outreach via mail and/or in-person store visits to distribute materials and ensure local retailers understand the compliance requirements under this new law.") (attached hereto as Exhibit 1).

*Third*, in the context of a compelled speech requirement, the standing issues animating *Carrico* are inapplicable. The *Carrico* plaintiffs were making a "chilled speech" argument—namely, that Proposition M forced them to engage in self-restraint in violation of the First Amendment. If the *Carrico* plaintiffs had no intention of engaging in the prohibited conduct, there was no risk that Proposition M would chill their expression. But here, CTIA's members are alleging that the City's regime is directly obligating them to carry government messages in violation of the First Amendment. There can be no doubt that Plaintiffs have standing to challenge laws that compel them to use their private property to carry government-drafted statements. *See, e.g.*, *Video Software Dealers Association v. Schwarzenegger*, 556 F.3d 950 (9th Cir. 2009) (addressing merits of association's claim that California labeling law violated the First Amendment); *see also Alliance for Open Soc. Int'l, Inc. v. U.S.A.I.D.*, 570 F. Supp. 2d 533, 540 (S.D.N.Y. 2008) ("[T]he fact that Associations' members are required to speak the Government's message in exchange for the Leadership Act subsidy is a sufficient injury-in-fact for their compelled speech claim. Plaintiff should not be forced to either forego their constitutional rights or risk legal action and the loss of their subsidies in order to have standing[.]"); *Kings English, Inc. v. Shurtleff*, 620 F. Supp. 2d 1272, 1281 (D. Utah 2007) ("[Plaintiffs] have demonstrated that they distribute material over the Internet that could be deemed 'harmful to minors.' By distributing such material, they will be subject to the labeling requirement imposed by § 76-10-1233. . . . [Plaintiffs] have standing to challenge § 76-10-1233.").

*Finally*, *Carrico* recognized that associations may bring actions where their members would have standing to sue in their own right, *Carrico*, 2011 WL 3890748 *2, and standing has not been questioned in the myriad cases in which parties, including those represented by associations, have challenged compelled speech obligations. *See, e.g.*, *Schwarzenegger*, 556 F.3d at 950; *see also Entertainment Software Ass'n v. Blagojevich*, 469 F.3d 641 (7th Cir. 2006); *New York State Restaurant Association v. New York City Board of Health*, 556 F.3d 114 (2d Cir. 2009); *National Electric Manufacturers Association v. Sorrell*, 272 F.3d 104 (2d Cir. 2001); *International Dairy Foods Association v. Amestoy*, 92 F.3d 67 (2d Cir. 1996). Here,

three members of CTIA—Verizon Wireless, AT&T, and T-Mobile USA—have all established their standing in declarations under oath or allegations in the Second Amended Complaint. CTIA's associational standing is beyond question here.

## II. FCC FINDINGS THAT CELL PHONES ARE SAFE.

The FCC has found and stated on numerous occasions that cell phones that comply with its regulations are safe for human use, has explained that to numerous courts, and has repeatedly assured the public of the same. Beginning in the 1996 *RF Order I*,[7] the FCC stated:

- "By this action, we are amending our rules to adopt new guidelines and methods for evaluating the environmental effects of radiofrequency (RF) radiation from FCC-regulated transmitters. We are adopting Maximum Permissible Exposure (MPE) limits for electric and magnetic field strength and power density for transmitters operating at frequencies from 300 kHz to 100 GHz. We are also adopting limits for localized ('partial body') absorption that will apply to certain portable transmitting devices. ***We believe that the guidelines we are adopting are sufficient to protect the public and workers from exposure to potentially harmful RF fields***." *RF Order I*, 11 F.C.C.R. at 15124 (¶ 1) (1996) (emphasis added, citations omitted). [Order cited at Motion for Preliminary Injunction, Dkt. No. 60, pages 3, 4, 9]

- "Most commenting parties, including Federal health and safety agencies, support the use of the ANSI/IEEE SAR limits for localized (partial body) exposure for evaluating low-power devices designed to be used in the immediate vicinity of the body. As mentioned above, the SAR limits specified by the ANSI/IEEE guidelines for devices used in controlled and uncontrolled environments are essentially the same as those recommended by NCRP for occupational and general population exposure, respectively. Therefore, in view of the consensus and the scientific support in the record, ***we are adopting SAR limits for the determination of safe exposure*** from low-power devices designed to be used in the immediate vicinity of the body based upon the 1992 ANSI/IEEE guidelines [i.e., cell phones]. We will apply the MPE limits we are adopting to certain mobile and unlicensed devices that, although not normally used within the immediate vicinity of the body, can use higher power and may be relatively close to the body of the user and to nearby persons. Examples of the latter are cellular "bag phones." *RF Order I*, 11 F.C.C.R. at 15146-47 (¶ 62) (1996) (emphasis added, citations omitted).

---

[7] *Guidelines for Evaluating the Environmental Effects of Radiofrequency Radiation*, 11 F.C.C.R. 15123 (1996) ("*RF Order I*").

Faced with petitions for reconsideration alleging that its standards were not sufficiently protective of public health, the FCC rejected those petitions and reaffirmed its standards in its 1997 *RF Order II*.[8] In doing so, it reaffirmed that cell phones that meet these standards are safe:

- "Some petitioners ask that we reconsider our previous decision not to adopt ANSI/IEEE C95.1-1992 in its entirety. Several other petitioners claim that the limits we adopted were not protective enough. The staff believes that no new and compelling justifications have been provided that would warrant a modification of the limits adopted in the *Report and Order*. Those limits were crafted to address concerns about ANSI/IEEE C95.1-1992 that had been raised by several agencies of the Federal Government with responsibility for health and safety. Furthermore, all of these agencies have written letters to the Commission supporting our new guidelines. ***We believe that the limits adopted in the Report and Order provide a proper balance between the need to protect the public and workers from exposure to excessive RF electromagnetic fields and the need to allow communications services to readily address growing marketplace demands***." *RF Order II*, 12 F.C.C.R. at 13497 (¶ 5) (1997) (emphasis added); *see also id*. (¶¶ 2, 29). [Order cited at Motion for Preliminary Injunction Dkt. No. 60, pages 4, 13, 17, 18]

- "As previously discussed in this Order and in the original Report and Order in this proceeding, we have relied on the advice and comments of the federal health and safety agencies as to what levels of RF exposure are protective of the public health. The Commission does not have the expertise to make independent judgements on such alleged health effects as 'electrosensitivity' or other reported effects on human health. This is the responsibility of the federal health and safety agencies and other qualified public health organizations. Therefore, ***we continue to consider our new guidelines appropriately protective of public health. There is no evidence to suggest that transmitters or facilities that comply with our guidelines will cause adverse health effects***. Our guidelines adopt the most conservative aspects of the ANSI/IEEE and the NCRP recommended exposure criteria and have been recommended by all of the relevant health and safety agencies. Moreover, we do not agree with the Ad-hoc Association and the Cellular Phone Taskforce that even a minimal extension of the initial transition period should be denied. We agree with Ameritech, Northeast, Airtouch and AT&T Wireless that a further extension is necessary to allow applicants and licensees sufficient time to analyze the newly revised version of OET

---

[8] *Procedures for Reviewing Requests for Relief from State and Local Regulations Pursuant to Section 332(c)(7)(B)(v) of the Communications Act of 1934*, 12 F.C.C.R. 13494, 13504-08 (¶¶ 31-39) (1997) ("*RF Order II*").

|   |   |
|---|---|
| 1 | Bulletin 65." *RF Order II*, 12 F.C.C.R. at 13538 (¶ 11) (1997) (emphasis added). |
| 2 |   |

The FCC's RF standards have twice been challenged on petition for review to a circuit court as insufficiently protective of public health and safety, and have twice been upheld. *See Cellular Phone Taskforce v. FCC*, 205 F.3d 82 (2d Cir. 2000) [Decision cited at Dkt. No. 60, pages 4, 18]; *see also EMR Network v. FCC*, 391 F.3d 269 (D.C. Cir. 2004) [Decision cited at Dkt. No. 60, page 4]. Moreover, citing the FCC's *RF Order I*, the Third Circuit has specifically found that "the FCC considers all phones in compliance with its standards to be safe." *Farina v. Nokia Inc.*, 625 F.3d 97 (3d Cir. 2010) (citing *RF Order I*, 11 F.C.C.R. at 15184 (¶ 169) (1996)) [Decision cited at Dkt. No. 60, pages 17, 18]. Other courts have also recognized that FCC-compliant phones are safe. *See, e.g.*, *Bennett v. T-Mobile USA, Inc.*, 597 F. Supp. 2d 1050, 1053 (C.D. Cal. 2008) ("Plaintiff claims that these phones are unsafe even though they do comply with FCC standards. . . . Allowing such claims would be to second-guess the balance reached by the FCC in setting RF emission standards under its delegated authority.") [Decision cited at Dkt. No. 60, page 18]; *Murray v. Motorola*, 982 A.2d 764, 776 (D.C. 2009) (finding preempted those claims that "conflict with the FCC determination that 'wireless phones that do comply with [the FCC's] RF standards are safe for use by the general public and may be sold in the United States.'" (quoting FCC *Murray* Brief)) [Decision cited at Dkt. No. 60, page 18].

In explaining the meaning of the findings in its Report and Orders and its RF safety standard to the courts, the FCC has also repeatedly stated that FCC-compliant phones are safe.

- "The FCC has determined that wireless phones that do comply with its RF standards ***are safe for use*** by the general public and may be sold in the United States." *See* Brief of the United States and the FCC as Amicus Curiae at 15-16, *Murray v. Motorola*, No. 07- cv-1074, 2008 WL 7825518 (D.C. Apr. 8, 2008) ("FCC *Murray* Brief") (citing *RF Order I*, ¶ 1) (emphasis added).[9] [FCC *Murray* Br. cited at Dkt. No. 60, pages 9, 13]

---

[9] CTIA did not submit a copy of the FCC *Murray* Brief as an attachment to its motion papers because it is publicly available, but we attach it here for ease of the Court's reference. It is attached as Exhibit 2.

- "The Commission has concluded that *its standards are adequate to protect the health and safety of the public*, based on the best available scientific evidence. The Commission has declined to set more stringent RF exposure limits, in light of the lack of scientific evidence demonstrating a need for further limits and the potential for such limits to impede the development of efficient, nation-wide wireless communications services." FCC *Murray* Brief at 10 (emphasis added).

- "The FCC exposure limit for the general public is *one-fiftieth of the point at which RF energy begins to cause any unhealthful thermal effect*." Brief for Respondents United States and FCC in Opposition at 3 n.2, *Cellular Phone Taskforce v. FCC*, No. 00-393, 2000 WL 33999532 (U.S. Dec. 4, 2000) (emphasis added). [Brief cited at Dkt. No. 60, pages 4, 13, 19]

- "Unlike the work force, members of the general public may be less well informed of the potential hazards of RF exposure and therefore have less control than workers over exposure to RF fields. The general public may also include persons of potential vulnerability, such as pregnant women or debilitated people. The general public is also much larger, so the number of people at risk is higher. **To take into account those differences between occupational and general exposure, NCRP (and ANSI) set an exposure limit for members of the general public of one-fifth of the occupational exposure, or 0.08 watts/kilogram, which is 1/50th of the adverse effects threshold.** To derive that figure, NCRP calculated that workers may be exposed to RF fields for 40 hours per week, while the general population is exposed all day every day, or 168 hours per week, which is about five times as much." Brief of Respondents FCC and United States, *Cellular Phone Task Force v. FCC*, No. 97-4328, 1998 WL 34097631 (2d Cir. July 6, 1998) (emphasis added). [Brief cited at Dkt. No. 60, page 4]

The FCC has also emphasized on numerous occasions to the public that compliance with its regulations means that cell phones are safe:

- "Since 1996, the FCC has required that all wireless communications devices sold in the United States meet its minimum guidelines for safe human exposure to radiofrequency (RF) energy." FCC, Guide, Wireless Devices and Health Concerns (http://www.fcc.gov/guides/wireless-devices-and-health-concerns).[10] [Page cited at Dkt. No. 60, pages 4, 9, 13, 16, 17; and as attachment to City's Sanders Declaration, Dkt. No. 68-8, page 3]

---

[10] The FDA likewise states that "[t]he scientific evidence does not show a danger to any users of cell phones from RF exposure, including children and teenagers." FDA, Radiation-Emitting Products, Children and Cell Phones (updated Mar. 10, 2009) (http://www.fda.gov/Radiation-EmittingProducts/RadiationEmittingProductsandProcedures/HomeBusinessandEntertainment/CellPhones/ucm116331.htm). Similarly, the FDA states that "[t]he weight of scientific evidence has not linked cell phones with any health problems." FDA, Radiation-Emitting Products, Health Issues (updated May 18, 2010) (http://www.fda.gov/Radiation-

- "Some parties recommend that you consider the reported SAR value of wireless devices. However, comparing the SAR of different devices may be misleading. First, the actual SAR varies considerably depending upon the conditions of use. The SAR value used for FCC approval does not account for the multitude of measurements taken during the testing. Moreover, cell phones constantly vary their power to operate at the minimum power necessary for communications; operation at maximum power occurs infrequently. Second, the reported highest SAR values of wireless devices do not necessarily indicate that a user is exposed to more or less RF energy from one cell phone than from another during normal use (see our guide on SAR and cell phones). Third, the variation in SAR from one mobile device to the next is relatively small compared to the reduction that can be achieved by the measures described above. **Consumers should remember that all wireless devices are certified to meet the FCC maximum SAR standards, which incorporate a considerable safety margin**. (Information about the maximum SAR value for each phone is publicly available on the FCC website.)" FCC, Wireless Devices and Health Concerns, (http://www.fcc.gov/guides/wireless-devices-and-health-concerns) (emphasis added).

In addition to these materials, which have already been cited in the record, the FCC has consistently taken this position in other public communications. For example, the FCC asserts the safety of phones that comply with its rules in other web sites maintained by the agency:

- "All wireless phones sold in the United States meet government requirements that limit their RF energy to safe levels." FCC, FAQs – Wireless Phones (http://www.fcc.gov/encyclopedia/faqs-wireless-phones#safe).

- "ALL cell phones must meet the FCC's RF exposure standard, which is set at a level well below that at which laboratory testing indicates, and medical and biological experts generally agree, adverse health effects could occur." FCC, Guide, Specific Absorption Rate (SAR) For Cell Phones: What It Means For You (http://www.fcc.gov/cgb/consumerfacts/sar.html).

And as recently as last Fall, the FCC again cited its findings in *RF Order I* to a court as support for the proposition that FCC-compliant phones are safe. *See* Letter from Austin C. Schlick, General Counsel, FCC to Tony West, Assistant Attorney General, DOJ (Sept. 13, 2010) (filed on Sept. 17, 2010 in *Dahlgren v. Audiovox* (D.C. Super. Ct., Case No. 2002 CA

---

EmittingProducts/RadiationEmittingProductsandProcedures/HomeBusinessandEntertainment/CellPhones/ucm116282.htm).

007884 B). A copy of this letter is attached hereto as Exhibit 3. After citing its findings in *RF Order I* and other orders, the FCC explained that "[i]t continues to be the Commission's position . . . that state law claims premised on the contention that FCC-compliant cell phones are unsafe are preempted by federal law." *Id.* at 2.

Dated: October 19, 2011                                JONES DAY

                                                       By:  /s/ Robert A. Mittelstaedt
                                                           Robert A. Mittelstaedt (#60359)
                                                           Craig E. Stewart (#129530)
                                                           JONES DAY
                                                           555 California Street
                                                           26th Floor
                                                           San Francisco, CA  94104
                                                           Telephone:  (415) 626-3939
                                                           Fax:  (415) 875-5700
                                                           ramittelstaedt@jonesday.com

                                                           Andrew G. McBride (pro hac vice)
                                                           Joshua S. Turner (pro hac vice)
                                                           Megan L. Brown
                                                           Brendan T. Carr
                                                           Wiley Rein LLP
                                                           1776 K Street, N.W.
                                                           Washington, DC  20006
                                                           Telephone:  (202)719-7000
                                                           Fax:  (202) 719-7049
                                                           amcbride@wileyrein.com

                                                           Terrence J. Dee (pro hac vice)
                                                           KIRKLAND & ELLIS LLP
                                                           300 North LaSalle
                                                           Chicago, IL  60654
                                                           Telephone:  (312) 862-2099
                                                           Fax:  (312) 862-2200
                                                           tdee@kirkland.com

                                                           Seamus C. Duffy (pro hac vice)
                                                           Susan M. Roach (pro hac vice)
                                                           Drinker Biddle & Reath LLP
                                                           One Logan Square
                                                           Suite 2000
                                                           Philadelphia, PA  19103-6996
                                                           Telephone:  (215) 988-2700
                                                           Fax:  (215) 988-2757

seamus.duffy@dbr.com

Jane F. Thorpe (pro hac vice)
Scott A. Elder (pro hac vice)
ALSTON & BIRD LLP
1201 West Peachtree St., NW
Atlanta, Georgia  30309-3424
Telephone: (404) 881-7592
Fax: (404) 253-8875
jane.thorpe@alston.com

Attorneys for Plaintiff
CTIA – The Wireless Association®

SFI-714572v1