**United States District Court**
For the Northern District of California

IN THE UNITED STATES DISTRICT COURT

FOR THE NORTHERN DISTRICT OF CALIFORNIA

CTIA – THE WIRELESS ASSOCIATION,

    Plaintiff,

    v.

THE CITY AND COUNTY OF SAN FRANCISCO, CALIFORNIA,

    Defendant.

No. C 10-03224 WHA

**ORDER ON MOTION FOR PRELIMINARY INJUNCTION**

### INTRODUCTION

With respect to the ordinance entitled "Cell Phone Disclosure Requirements," recently adopted by the City and County of San Francisco, this order **SUSTAINS** its requirement to make available informational fact-sheets (to be corrected as indicated below) but **ENJOINS** the remainder of the ordinance as violative of the First Amendment.

### STATEMENT

In anticipation of the looming compliance date for a cell phone right-to-know ordinance adopted by the City and County of San Francisco, plaintiff CTIA – The Wireless Association challenges the ordinance as violative of the First Amendment and as preempted by federal law. The ordinance applies to cell phone providers who sell through any retailer in San Francisco and to any cell phone retailers therein who sell or lease cell phones. It requires cell phone retailers to inform customers about issues pertaining to radiofrequency ("RF") energy emissions and about

1  precautions to minimize exposure to RF energy.  Specifically, retailers are required to
2  prominently display an informational poster in the store, to provide every customer with an
3  information fact-sheet, and to paste an informational sticker on all display literature for cell
4  phones.

### 1. THE ORIGINAL ORDINANCE.

The ordinance at issue is an amended version of a prior ordinance passed in 2010. That ordinance had two basic requirements, both tied to "SAR values."  SAR means Specific Absorption Rate, a measure of the amount of RF energy absorbed by the body from cell phones. It required cell phone service providers selling through a retailer in San Francisco to provide those retailers with the SAR value for each cell phone.  In turn, it also required retailers to post those SAR values.

### 2. THE LITIGATION.

In 2010, CTIA commenced this action against the City and County of San Francisco, alleging the original ordinance was preempted by federal law and seeking declaratory and injunctive relief.  Thereafter, pursuant to its rulemaking authority, the San Francisco Department of the Environment released drafts of the warning materials and requested public comment. According to San Francisco, the user tips included in the original display materials "were taken directly from the FCC's website" where the word "radiation" was used numerous times.

Subsequent to CTIA's filing of its lawsuit, the FCC modified its wireless-device fact-sheet and omitted any suggestion to buy a phone with a lower SAR value, stating instead that SAR was not useful for comparing phones and would be potentially misleading if used for that purpose. The new FCC fact-sheet added the following:  "*The FCC does not endorse the need for these practices*, but provides information on some simple steps that you can take to reduce your exposure to RF energy from cell phones" (Sanders Exh. H).

Early this year, CTIA filed a first amended complaint alleging preemption and violation of the First Amendment (Dkt. No. 42).  Pursuant to a stipulation, San Francisco agreed to stay enforcement of the original ordinance and regulations until June 15, 2011, in order "to make

2

substantive revisions to the disclosures required by the Ordinance and the accompanying Regulations" (Dkt. No. 44).

### 3. THE REVISED AND OPERATIVE ORDINANCE.

Amendments were made to the ordinance to meet issues raised in the litigation. The stated purpose of the amended ordinance — the ordinance now at issue — was to "improve and strengthen the disclosures required under the original Cell Phone Right-to-Know Ordinance to better achieve this public health purpose." Requirements to disclose SAR values were removed from the amended ordinance, as were references to "radiation." The findings section of the ordinance stated that until the FCC and the scientific community develop a

> metric for measuring the actual amount of radiofrequency energy an average user will absorb from each model of cell phone. [I]t is in the interest of the public health to require cell phone retailers to inform consumers about the potential health effects of cell phone use, and about measures they can take to reduce their exposure to radiofrequency energy from cell phones.

On July 26, 2011, the Board unanimously enacted the amended ordinance. It has three main requirements. *First*, it requires cell phone retailers to "display in a prominent location visible to the public, within the retail store, an informational poster developed by the Department of the Environment" (§ 1103(a)). *Second*, it requires cell phone retailers to provide "every customer that purchases a cell phone a free copy of an informational factsheet developed by the Department of the Environment. [T]his factsheet must also be provided to any customer who requests it, regardless of whether they purchase a cell phone or not" (§ 1103(b)). *Third*, it states that (§ 1103(c)):

> if a cell phone retailer posts display materials in connection with sample phones or phones on display, the display materials must include . . . three informational statements, whose contents, and size, and format as printed, shall be determined by the Department of the Environment: (1) A statement explaining that cell phones emit radiofrequency energy that is absorbed by the head and body; (2) A statement referencing measures to reduce exposure to radiofrequency energy from the use of a cell phone; and (3) A statement that the informational factsheet . . . is available from the cell phone retailer upon request.

1    Section 1104 mandates the Department of the Environment to develop an informational
2 poster, fact-sheet, and statements to be included in the promotional materials, and to issue
3 regulations specifying the contents, size, and format for the materials.

4    Section 1105 requires the City Administrator to issue a "written warning" to any person
5 in violation of the ordinance and permits imposition of administrative fines, if thirty days after
6 issuance of the written warning, the City Administrator finds that the person who received the
7 warning continues to violate the ordinance. An administrative fine of up to $100 may be issued
8 for the first violation, up to $250 for the second violation within a twelve-month period, and up
9 to $500 for the third and subsequent violations within a twelve-month period. Violation of the
10 ordinance is not a crime; the ordinance will be enforced only through administrative fines.

11    The Mayor signed the ordinance into law on August 3, 2011. The ordinance took effect
12 on September 6. The ordinance required that, within fifteen days of the effective date or as soon
13 thereafter as practicable, the Department of the Environment adopt implementing regulations
14 after giving public notice and holding a hearing. The Department released its draft regulations
15 on September 16 and scheduled a public hearing for September 26. Four days after the public
16 hearing, the Department issued final regulations specifying the poster, fact-sheet, and sticker for
17 in-store displays. At the hearing, San Francisco agreed to postpone the compliance date pending
18 decision on this motion.

19    At issue, in short, are a poster, a fact-sheet, and a sticker. The poster, which is eleven
20 inches by seventeen inches, states at the top: "**CELL PHONES EMIT RADIO-FREQUENCY**
21 **ENERGY**." Below that are human silhouettes, one with a cell phone near an ear and the other
22 with a cell phone near a hip. The poster depicts red and yellow circles radiating from the phones
23 into the bodies. The silhouettes take up half of the poster and are the main feature. Below the
24 silhouettes, the poster states: "Studies continue to assess potential health effects of mobile phone
25 use. If you wish to reduce your exposure, the City of San Francisco recommends that you:

26    • Keep distance between your phone and body,
27    • Use a headset, speakerphone, or text instead,
28    • Ask for a free factsheet with more tips.

4

1  Below this message, there is a reference to websites for the San Francisco Department of the
2  Environment, the FCC, and the World Health Organization.  A tiny statement that reads:
3  "This material was prepared solely by the City and County of San Francisco and must
4  be provided to consumers under local law" is viewable at close range on the top and bottom of the
5  poster.  The municipal seal appears on the poster (Opp. Exh. A).

6  The fact-sheet, which is a little over eight by five inches, states: "**YOU CAN LIMIT**
7  **EXPOSURE TO RADIO-FREQUENCY (RF) ENERGY FROM YOUR CELL PHONE.**"  The same radiated
8  silhouettes as described above dominate the fact-sheet.  The fact-sheet next states:  "ALTHOUGH
9  STUDIES CONTINUE TO ASSESS POTENTIAL HEALTH EFFECTS OF MOBILE PHONE USE, THE WORLD
10 HEALTH ORGANIZATION HAS CLASSIFIED RF ENERGY AS A POSSIBLE CARCINOGEN."  A tiny
11 disclaimer that the material was prepared by San Francisco, as well as the municipal seal also
12 appear on the fact-sheet.  The back side of the fact-sheet states:

> If you are concerned about potential health effects from cell phone
> RF energy, the City of San Francisco recommends:
>
> • Limiting cell phone use by children,
>
> • Using a headset, speakerphone or text instead,
>
> • Using belt clips and purses to keep distance between your
>   phone and body,
>
> • Avoiding cell phones in areas with weak signals (elevators,
>   on transit, etc.),
>
> • Reducing the number and length of calls.

Subtexts elaborate on each recommendation.  The websites listed above are repeated.

The sticker, which is one by 2.5 inches, states:  "Your head and body absorb RF Energy from cell phones.  If you wish to reduce your exposure, ask for San Francisco's free factsheet." Stores must affix this to their display literature for cell phones and must supply their own paste.

San Francisco expressly based its rule on the absence of a definitive study ruling out any and all risk of harm, stating:  "It is the policy of the City and County of San Francisco to adhere to the Precautionary Principle, which provides that the government should not wait for scientific proof of a health or safety risk before taking steps to inform the public of the potential for harm" (Ordinance 165-11 § 1).

5

**4.  THE INSTANT MOTION.**

CTIA recently filed a second amended complaint, alleging preemption and violation of the First Amendment and moved for a preliminary injunction (Dkt. No. 60).

**ANALYSIS**

**1.  PREEMPTION.**

In the motion at bar, the only preemption argument made concerns "conflict" preemption. This argument fails because there is no conflict. Nothing in the federal statutes or FCC regulations bars local disclosure requirements like those now required in San Francisco.

The industry preemption argument really boils down to this: The FCC found cell phones safe but San Francisco requires retailers to say they are unsafe. The industry argument, however, is an overstatement. The FCC has never found that cell phones are absolutely safe. Instead, it has balanced the "need to protect the public and workers from exposure to excessive RF electromagnetic fields and the need to allow communication services to readily address growing marketplace demands." RF Order II at ¶ 29. Very likely, the balance struck by the FCC provides a large measure of protection to the public but even the FCC has never found that the balance struck will protect the entire public from any and all RF radiation hazards.

This case is unlike *Farina v. Nokia, Inc.*, 625 F.3d 97, 104 (3d Cir. 2010), a putative class action on behalf of cell phone users, alleging that the marketing of cell phones as safe for use without headsets violated Pennsylvania law since allegedly the phones were unsafe due to RF radiation. The Third Circuit ended the action on preemption grounds because imposing such liability would upset the RF emission balance struck by the FCC. Worse, state-by-state emission standards would undermine a single national standard. *Id*. at 125–26. By contrast, San Francisco does not wish to set its own emission standards or to impose liability for compliance with the FCC standard but only seeks to warn consumers of a perceived public health risk and to inform consumers how to mitigate the perceived risk. The field of consumer disclosures to cell phone purchasers has not been occupied by the FCC (even though the field of technical-emission standards has been so occupied). *Murray v. Motorola, Inc.*, 982 A.2d 764, 786–88 (D.C. 2009).

6

### 2. FIRST AMENDMENT.

Both sides have cited numerous First Amendment decisions. The Court has read many of them and all of the main ones. Rather than expound on them one by one, this order will summarize their import, as follows.

In the commercial marketplace, the First Amendment permits a government to require businesses to disclose accurate and uncontroversial facts as long as the disclosures are reasonably related to a governmental interest in preventing deception or in protecting public health and safety, among other allowable objectives, and a government may do so without meeting any "least restrictive means" test. Mandatory disclosures by businesses of government opinions and viewpoints, by contrast, are subject to more exacting scrutiny. Likewise, even mandatory disclosure of mere facts are subject to more exacting scrutiny where the disclosure would harm another First Amendment value, such as charitable telephone or door-to-door solicitations. *E.g.*, *Rumsfeld v. FAIR*, 547 U.S. 47, 60–68 (2006); *Riley v. Nat. Fed. of the Blind of N.C., Inc.*, 487 U.S. 781, 798–99 (1988); *Pac. Gas & Elec. Co. v. Pub. Util. Comm'n*, 475 U.S. 1, 8–20 (1986); *Zauderer v. Office of Disciplinary Counsel*, 471 U.S. 626, 651 (1985); *Beeman v. Anthem Prescription Mgt., LLC*, 652 F.3d 1085, 1098–99 (9th Cir. 2011); *Video Software Dealers Ass'n v. Schwarzenegger*, 556 F.3d 950, 966 (9th Cir. 2009); *Envtl. Def. Ctr., Inc. v. EPA*, 344 F.3d 832, 848–49 (9th Cir. 2003).

Whether or not cell phones cause cancer is a debatable question and, at this point in history, is a matter of opinion, not fact. San Francisco has its opinion. The industry has the opposite opinion. Can San Francisco force the industry to disseminate the government opinion? Were the issue this clear-cut, then more exacting scrutiny would apply under the First Amendment. *Int'l Dairy Food Ass'n v. Amestoy*, 92 F.3d 67, 72–74 (2d Cir. 1996).

San Francisco has deftly dodged this opinion problem by editing the text down to a series of factoids, all of which seem to be literally true, as far as they go. So, at least as to the wording, we are concerned with less exacting scrutiny and concerned with the first sentence in the law summarized above.

Public health is the governmental interest. It is important, however, to be precise in identifying the actual interest. San Francisco's claimed interest falls short of protecting the public from a "known" carcinogen or even from a "probable" carcinogen but amounts only to protecting the public from a "possible" carcinogen, meaning that no one yet knows if the agent (RF radiation) is actually harmful (or not). More specifically, the San Francisco regulation is anchored in a classification made by the World Health Organization. WHO, through its International Agency for Cancer Research, has divided over 900 substances into the following categories:

- Carcinogenic to humans (107);
- Probably carcinogenic to humans (59);
- Possibly carcinogenic to humans (267);
- Not classifiable as to its carcinogenicity to humans (508);
- Probably not carcinogenic to humans (1).

The number in parenthesis indicates the number of agents placed in each category; so, for example, only one substance has been cleared as "probably not carcinogenic" to humans. In the "possibly" category are 267 items. These include coffee, pickled vegetables and "radio frequency electromagnetic fields," a broad category that includes but is not limited to cell phones.

In order to place an agent on the "possibly" carcinogen list, the IARC uses the following criteria:

> This category is used for agents for which there is *limited evidence of carcinogenicity* in humans and less than *sufficient evidence of carcinogenicity* in experimental animals. It may also be used when there is *inadequate evidence of carcinogenicity* in humans but there is *sufficient evidence of carcinogenicity* in experimental animals. In some instances, an agent for which there is *inadequate evidence of carcinogenicity* in humans and less than *sufficient evidence of carcinogenicity* in experimental animals together with supporting evidence from mechanistic and other relevant data may be placed in this group. An agent may be classified in this category solely on the basis of strong evidence from mechanistic and other relevant data.

8

In other words, the "possible" group is a weaker group than the "probably carcinogenic" group and weaker still than the "carcinogenic" group; it does not take much to list something as "possible"; only one item has ever been cleared as "probably not carcinogenic."[1]

In June of this year, the WHO released a fact-sheet entitled "Electromagnetic Fields and Public Health: Mobile Phones." This fact-sheet states in part:

> A large number of studies have been performed over the last two decades to assess whether mobile phones pose a potential health risk. To date, no adverse health effects have been established as being caused by mobile phone use.

*See* who, *Electromagnetic Fields and Public Health: Mobile Phones*, Fact Sheet 193 (June 2011), *available* at http://www.who.int/mediacentre/factsheets/fs193/en.

Significantly, therefore, the word "risk" is being used by the City and County of San Francisco in a way different from the usual way. Usually, for example, we say smoking presents a "risk" in the sense that smoking is a known carcinogen but may or may not produce cancer in any given smoker, so there is a statistical risk that smoking will lead to cancer for any given individual. As for anything in the "possibly carcinogenic" category, however, there is no known statistical correlation and the word "risk" is being used in a different way, namely that there is a "risk" that the "possible" may turn out to be a "definite." This use of "risk" in this way is a large step shy of the normal use of "risk."

Is the mere unresolved possibility that something may (or may not) be a carcinogen enough to justify compelled warnings and compelled recommended precautions by store owners? For example, given that coffee is also on the WHO list, would the mere unresolved possibility that coffee may be a carcinogen justify a regulation compelling coffee shops to display posters and hand out fact-sheets?

In a different context, a finding that a substance is actually harmful must be made before it can be regulated. *See Indus. Union Dep't, AFL-CIO v. Am. Petroleum Inst.*, 448 U.S. 607, 653 (1980). In that OSHA decision, the Supreme Court rejected OSHA's argument based on the

---

[1] This information is taken from WHO's website. IARC, Preamble at 23 (http://monographs.iarc.fr/ENG/Preamble/CurrentPreamble.pdf).

9

1    precautionary principle and held that OSHA must first affirmatively find that long-term exposure
2    to the regulated substance (there benzene) presented a "significant risk of material health
3    impairment." That decision interpreted the statutory authority of the Secretary of Labor and thus
4    is only of interest because it is one of the few occasions a court has addressed the public policy
5    rationale at issue. It is instructive only by analogy. It does suggest the question whether, before
6    the government can burden the speech interests of commercial retailers in the way here
7    proposed, should the government be required to find that it is more likely than not that the
8    substance is harmful. *See AFL-CIO v. Deukmejian*, 212 Cal. App. 3d 425, 437 (1989). This
9    order, however, does not so hold and presumes that a government may impose, out of caution, at
10   least some disclosure requirements based on nothing more than the possibility that an agent
11   may (or may not) turn out to be harmful.

12   This order, therefore, proceeds on the presumption that San Francisco may require
13   disclosure of accurate and uncontroversial facts as long as the disclosure requirements are
14   reasonably related to its interest in alerting the public to a possible public health risk and to
15   its interest in suggesting precautionary steps to mitigate the risk. Applying this standard, the
16   ordinance is sustained in part and disapproved in part, as follows.

17         **A.    The Fact-Sheet.**

18   The reader will remember that the fact-sheet to be given to customers is a little over
19   five by eight inches. Its largest headline states: **"YOU CAN LIMIT EXPOSURE TO**
20   **RADIO-FREQUENCY (RF) ENERGY FROM YOUR CELL PHONE."** This is followed by two
21   large dark silhouettes of the human body, side-by-side, like the kind used as targets at firing
22   ranges. These silhouettes are the dominant feature on the entire page. One has a cell phone
23   beaming bold red and yellow circles into the head. The other has a cell phone beaming bold
24   red and yellow circles into the hip and groin regions. These silhouettes are followed by
25   medium-size print stating: "ALTHOUGH STUDIES CONTINUE TO ASSESS POTENTIAL HEALTH
26   EFFECTS OF MOBILE PHONE USE, THE WORLD HEALTH ORGANIZATION HAS CLASSIFIED RF ENERGY
27   AS A POSSIBLE CARCINOGEN." A tiny footnote then states that the material is prepared solely by
28   the City and County of San Francisco and must be provided to consumers under local law.

10

1   The back side has a medium-sized font beginning, "IF YOU ARE CONCERNED ABOUT
2   POTENTIAL HEALTH EFFECTS FROM CELL PHONE RF ENERGY, THE CITY OF SAN FRANCISCO
3   RECOMMENDS:" This is followed by five ideas to reduce exposure. In smaller print, the
4   back side lists three websites where the consumer can "learn more." Once again, a tiny footnote
5   states that the material was prepared solely by the City and County of San Francisco.
6   The municipal seal appears on both sides.

   On the fact-sheet, San Francisco has edited the mandated disclosures down to a few
statements — largely accurate as far as they go — such as, to repeat, cell phones radiate RF
(true); cell phone users are subjected to RF energy (true); the closer the phone, the stronger the
RF energy (true), and so on. Given that the factoids are accurate or at least have some anchor
in the scientific literature, it is hard to see why, subject to the criticisms below, San Francisco
cannot require their disclosure so long as there is a plausible public health threat and so long
as it is clear to everyone that the warnings come from local government and not from the store.
Even the FCC has implicitly recognized that excessive RF radiation is potentially dangerous.
It did so when it "balanced" that risk against the need for a practical nationwide cell phone
system. The FCC has never said that RF radiation poses no danger at all, only that RF radiation
can be set at acceptable levels. Given this implicit recognition of a risk and given the "possible
carcinogen" classification by the World Health Organization, it cannot be said that San Francisco
has acted irrationally in finding a potential public health risk and in requiring disclosures to
mitigate that potential risk.[2]

   Nonetheless, the fact-sheet is misleading and must be corrected. Although each factoid
in isolation may have an anchor in some article somewhere, the overall message of the fact-sheet
(and the poster, for that matter) is misleading by omission in two important ways. The overall
impression left is that cell phones are dangerous and that they have somehow escaped the
regulatory process. That impression is untrue and misleading, for all of the cell phones sold in
the United States must comply with safety limits set by the FCC. In other words, the uninitiated

---

[2] Contrary to CTIA, the FCC itself has never said exposure to RF in all circumstances is totally safe. Statements of that sort have only been made by Justice Department lawyers in litigation.

11

will be left with the misleading impression that the phones on sale have never been vetted by the FCC (or any other agency) — which, of course, is untrue. This would be misleading enough. But, even worse, the poster and the fact-sheet cite to the FCC's own website as if, should it be consulted, the overall misimpression would be confirmed. Once consulted, however, the FCC's message is very much the opposite. This overall misleading impression, however, could be corrected by adding a statement to the effect, "All cell phones sold in the United States must comply with RF safety limits set by the FCC" or, if San Francisco would prefer, "Although all cell phones sold in the United States must comply with RF safety limits set by the FCC, no safety study has ever ruled out the possibility of human harm from RF exposure." If this corrective item is unacceptable to San Francisco, then the entire program will be enjoined and San Francisco should broadcast its message at its own expense rather than compelling retailers to disseminate misleading statements.

   A second misleading omission is the failure to explain the limited significance of the WHO "possible carcinogen" classification. The uninitiated will tend to misunderstand this as more dangerous than it really is because they will go uninformed that RF energy falls short of the "carcinogenic to humans" category and even short of the "probably carcinogenic to humans" category. To cure this misimpression, the fact-sheet should state, "RF Energy has been classified by the World Health Organization as a possible carcinogen rather than as a known carcinogen or a probable carcinogen and studies continue to assess the potential health effects of cell phones." Both corrections should be made in a font equal in dignity to that used throughout the fact-sheet, namely at least equivalent to the medium-sized font.

   As for the large silhouettes with RF beaming into the head and hips, they are not facts but images subject to interpretation. One plausible interpretation is that cell phones are dangerous. This is not the only possible meaning but since the public might easily understand it in this way, the image must be scrutinized in that light. So viewed, the image conveys a message that is neither factual nor uncontroversial, for cell phones have not been proven

1  dangerous. The silhouettes are too much opinion and too little fact. This is not cured by the
2  writing elsewhere on the page, even as to be corrected. The silhouettes must be deleted.[3]

### B. The Poster.

For the same reasons, the poster is likewise deficient but, more fundamentally, given that the fact-sheet is approved (with the corrections), this order finds that the large wall poster is not reasonably necessary and would unduly intrude on the retailers' wall space. All consumers who actually purchase a cell phone will receive the handout. There is no reasonable cause for requiring retailers to convert their walls to billboards for the municipal message.

### C. The Stickers.

The "sticker" requirement is also unconstitutional. Under the ordinance, if cell phone retailers put up their own display materials in connection with sample phones on display, as of course they do and will, all display materials "must include" a statement that cell phones emit radiofrequency energy that is absorbed by the head and body; a statement referencing measures to reduce exposure to RF cell phone energy, and a statement that an informational fact-sheet is available upon request. The implementing regulations have turned this into a sticker requirement, such that the following sticker must be pasted on all in-store displays:

> Your head and body absorb RF Energy from cell phones.
> If you wish to reduce your exposure, ask for
> San Francisco's free factsheet.

This goes too far. The stickers will unduly intrude upon the retailers' *own* message. Under the regulations, the mandatory stickers need not even state that the sticker message is solely the view of local government (§ 1103). But even if that were added (thereby enlarging even more the footprint of the sticker), it would still be unconstitutional to force retailers to paste the stickers over their own promotional literature. This would unduly interfere with the retailers' own right to speak to customers. Under the First Amendment, the retailers can communicate

---

[3] The requirement to hand out the fact-sheet to non-buying customers as well as buying customers is upheld so long as the above corrections are made.

13

1  their message and San Francisco, within reason, can force the retailers to communicate its
2  message too, but San Francisco cannot paste its municipal message over the message of the
3  retailers. *See Entm't Software Ass'n v. Blagojevich*, 469 F.3d 641, 652 (7th Cir. 2006).

### 3.  THE REMAINING FACTORS.

Before granting a preliminary injunction, the law requires consideration of the following additional considerations. *Alliance for the Wild Rockies v. Cottrell*, 632 F.3d 1127 (9th Cir. 2011).

Irreparable injury is presumed from a First Amendment violation. *Elrod v. Burns*, 427 U.S. 347, 373 (1976).

The balance of equities and the public interest factor favor preliminary relief. The FCC has been studying radio since 1934 and based its cell phone emission standards on the "best scientific evidence available" after exhaustively gathering inputs from other federal agencies also concerned with human health. The FCC set a conservative standard, one weighted heavily in favor of minimizing any public health hazard. San Francisco has long been bathed in RF radiation from the Sutro Tower transmitting facilities, from radar, from hand-held television remotes, from portable phones, from WiFi (vigorously promoted by San Francisco itself), from WiFi-equipped notebook computers, from cell towers, from satellites, not to mention EMF radiation from our AC power infrastructure dating back a hundred years or more. If this exposure has been so dangerous, one might ask reasonably why hasn't it manifested itself by now? If there is a link, it must be weak or slow-acting. San Francisco concedes that there is no evidence of cancer caused by cell phones. San Francisco relies instead on its "precautionary principle," on the WHO classification of RF as a "possible carcinogen," and the argument that it should not have to wait until deaths start to occur to regulate. This presupposes that deaths *will* occur. But the evidence of impending death is weak. In weighing the equities, this must be considered. Put differently, no substantial public interest will be harmed by the preliminary relief granted above and the balance of equities favors it.

\*          \*          \*

The Court has also considered enjoining the entire ordinance based on the "serious questions" alternative for provisional relief, see Alliance for the Wild Rockies, 632 F.3d at 1137, but under that inquiry, irreparable injury still must be shown and cannot be presumed, there being no finding of a First Amendment violation under a "serious questions" analysis. There really will be little irreparable injury in complying with the fact-sheet so long as the corrections are included to mitigate the nonfactual, misleading and alarmist tenor of the fact-sheet. The San Francisco program is not aimed at slowing sales. It is aimed at precautions for consumer use and presupposes that all sales will flow unabated. Industry profits will not sag. *Winter v. NRDC*, 555 U.S. 7, 23 (2008).

## CONCLUSION

By **NOON ON NOVEMBER 4, 2011**, counsel shall meet and confer, shall agree on a revised fact-sheet to include the corrections described above, and shall submit an agreed-on version conforming to this order (reserving all appeal rights) or, failing agreement, shall submit their competing versions without further briefing. Please do not re-argue the main issues. If San Francisco will not accept the above corrective items, then the entire ordinance will be **ENJOINED** as violative of the First Amendment. Through **NOVEMBER 30**, the entire ordinance is temporarily **STAYED** in order to allow applications to promptly be made to the court of appeals to modify this order. After that date, the fact-sheet requirement, once corrected and vetted by the Court, may be enforced by San Francisco unless stayed by the court of appeals.

**IT IS SO ORDERED.**

Dated: October 27, 2011.

WILLIAM ALSUP
UNITED STATES DISTRICT JUDGE