PAGES 1 – 40

UNITED STATES DISTRICT COURT

NORTHERN DISTRICT OF CALIFORNIA

BEFORE THE HONORABLE WILLIAM H. ALSUP

| | |
|---|---|
| CTIA – THE WIRELESS ASSOCIATION, ) | |
| ) | |
| PLAINTIFF, ) | |
| ) | |
| VS. ) | NO. C 10–3224 WHA |
| ) | |
| THE CITY AND COUNTY OF SAN ) | |
| FRANCISCO, ) | |
| ) | SAN FRANCISCO, CALIFORNIA |
| DEFENDANTS. ) | THURSDAY |
| ) | OCTOBER 20, 2011 |
| _____ ) | |

**TRANSCRIPT OF PROCEEDINGS**

**APPEARANCES:**

**FOR PLAINTIFF**        JONES DAY
                         555 CALIFORNIA STREET
                         26TH FLOOR
                         SAN FRANCISCO, CALIFORNIA  94104
                **BY:  ROBERT A. MITTELSTAEDT, ESQUIRE**


                         WILEY REIN, LLP
                         1776 K STREET NW
                         WASHINGTON, DC  20006
                **BY:  ANDREW G. MCBRIDE, ESQUIRE**
                     **MEGAN L. BROWN, ESQUIRE**


                         DRINKER, BIDDLE & REATH, LLP
                         ONE LOGAN SQUARE
                         SUITE 2000
                         PHILADELPHIA, PENNSYLVANIA  19103
                **BY:  SEAMUS C. DUFFY, ESQUIRE**


(FURTHER APPEARANCES ON FOLLOWING PAGE)

***REPORTED BY:***  JOAN MARIE COLUMBINI, CSR 5435, RPR
                OFFICIAL COURT REPORTER, U.S. DISTRICT COURT

**APPEARANCES (CONTINUED):**

**FOR DEFENDANT**  DENNIS J. HERRERA
CITY ATTORNEY
CITY HALL, ROOM 234
1 DR. CARLTON B. GOODLETT PLACE
SAN FRANCISCO, CALIFORNIA  94102
BY:  **VINCE CHHABRIA**
**DEPUTY CITY ATTORNEY**

1          <u>**PROCEEDINGS; THURSDAY, OCTOBER 20, 2011**</u>

2

3          **THE COURT:**  LET'S GO NOW TO CTIA VERSUS CITY AND

4   COUNTY OF SAN FRANCISCO.

5          **MR. MITTELSTAEDT:**  GOOD MORNING, YOUR HONOR.  BOB

6   MITTELSTAEDT, JONES DAY, FOR CTIA.  WITH ME ARE ANDREW MCBRIDE

7   AND SEAMUS DUFFY AND JANE THORPE.  MR. MCBRIDE WILL ADDRESS THE

8   FIRST AMENDMENT ISSUES, IF IT PLEASE THE COURT.

9          **THE COURT:**  TIME IS GOING TO BE SHORT.

10          **MR. MITTELSTAEDT:**  AND MR. DUFFY ON THE PREEMPTION.

11          **THE COURT:**  EACH SIDE HAS ABOUT 20 MINUTES TOTAL.

12   LET'S HEAR FROM THE CITY AND COUNTY OF SAN FRANCISCO.

13          **MR. CHHABRIA:**  GOOD MORNING, YOUR HONOR.  VINCE

14   CHHABRIA FROM THE CITY AND COUNTY OF SAN FRANCISCO.  WITH ME

15   TODAY IS SUSHMA ATHIA FROM THE SAN FRANCISCO DEPARTMENT OF THE

16   ENVIRONMENT.

17          **THE COURT:**  THANK YOU.  WELCOME.  LET'S HEAR FROM THE

18   MOVING PARTY.

19          **MR. MCBRIDE:**  GOOD MORNING, YOUR HONOR.  ANDREW

20   MCBRIDE FOR CTIA.  I WILL BE BRIEF.  I KNOW THE COURT IS

21   PRESSED FOR TIME.

22          THREE LEGAL POINTS, ONE PRACTICAL POINT.

23          LEGAL POINT IS, TRY AS IT MIGHT, THE CITY SIMPLY

24   CAN'T SHOEHORN THESE MATERIALS INTO THE NARROW *ZAUDERER*

25   EXCEPTION FOR THINGS LIKE CALORIE COUNT OR MERCURY.  HERE WE

1  HAVE THREE STRAIGHT PIECES OF MATERIAL THAT EXPRESS VIEWS ABOUT

2  HOW THE FCC HAS DONE ITS JOB WHETHER OR NOT CELLPHONES ARE

3  SAFE, AND ALSO HOW YOU SHOULD USE CELLPHONES, WHO SHOULD USE

4  CELLPHONES, WHERE CELLPHONES SHOULD BE USED.  THAT IS NOT THE

5  PURELY FACTUAL INFORMATION THAT IS ALLOWED UNDER *ZAUDERER* AND

6  UNDER *SCHWARZENEGGER*, UNDER THE NINTH CIRCUIT CASE IN

7  *SCHWARZENEGGER*, THAT WAS AFFIRMED BY THE SUPREME COURT.

8          THE SECOND POINT IS THAT EVEN IF *ZAUDERER* APPLIED,

9  THEY COULDN'T PASS THE TEST BECAUSE IT HAS TO BE TRUE, AND SOME

10 OF THE SPEECH HERE IS NOT TRUE, IS MISLEADING, AND THE COURT

11 HAS IN THE RECORD --

12          **THE COURT:**  WHICH PART IS NOT TRUE?

13          **MR. MCBRIDE:**  IT IS NOT TRUE THAT TISSUE OF CHILDREN

14 ABSORBS RF ENERGY IN ANY WAY DIFFERENT FROM THE TISSUE OF

15 ADULTS.

16          I WOULD SAY SORT OF THE BIG PICTURE HERE IS THAT THE

17 FCC HAS SET A STANDARD THAT HAS 50-FOLD SAFETY FACTOR IN IT SO

18 THAT ALL PHONES ARE SAFE.  AND SO THE IDEA THAT YOU BECOME

19 SAFER IF YOU HOLD THE PHONE AWAY FROM YOU OR TURN THE PHONE OFF

20 IS FALSE.  AND, YOUR HONOR, THE SCIENCE THERE -- AND IT'S IN

21 THE PETERSEN DECLARATION, WHICH IS UNREBUTTED.

22          THE SCIENCE THERE IS -- THE ANALOGY I USE IS A LIGHT

23 BULB.  AN 80-WATT LIGHT BULB WON'T HURT YOUR EYES.  IT WILL NOT

24 BURN YOUR RETINA.  ARE YOU ANY SAFER WITH A 60-WATT LIGHT BULB?

25 NO, YOU'RE NOT ANY SAFER.  IT'S A THRESHOLD PHENOMENON.  AT

1  SOME VERY HIGH POINT LIGHT WILL HURT YOUR EYES.  BUT THE

2  DIFFERENCE BETWEEN 80 AND 60 IS NOT RELEVANT FROM A SCIENTIFIC

3  POINT OF VIEW.  THAT STANDS UNREBUTTED IN THE RECORD.  THAT'S

4  SORT OF THE WHOLE MESSAGE.

5           THE THIRD POINT I WOULD MAKE IS -- I WOULD ASK IF ANY

6  COLLEAGUE CAN APPROACH THE BENCH AND HAND UP THE ACTUAL

7  MATERIALS THEMSELVES?

8           **THE COURT:**  SURE.

9           **MR. MCBRIDE:**  THE THIRD POINT I WOULD MAKE HERE IS,

10  IF THIS IS NOT A WARNING, I DON'T KNOW WHAT IS.  AND, IN

11  PARTICULAR, I'M TALKING ABOUT THE POSTER THAT IS BEING HANDED

12  UP TO THE COURT NOW, AND THE INFORMATION SHEET, AND ALSO THE

13  STICKER.  AND WE HAVE INCLUDED FOR YOUR HONOR AN EXEMPLAR WHICH

14  I THINK HAS BEEN EVEN GIVEN TO MR. CHHABRIA OF WHAT'S CALLED A

15  CALL-OUT CARD IN A VERIZON STORE.

16           OUR POINT ON THAT -- THE COURT HAS THAT IN ITS HAND

17  NOW.  OUR POINT ON THAT IS EXACTLY WHAT THE COURT IS DOING NOW.

18  YOU KNOW, YOU CAN'T PASS *ZAUDERER* IF SOME OF OUR SPEECH IS

19  KNOCKED OUT.  AND CLEARLY HERE, WITH THESE CALL-OUT CARDS,

20  WHICH THE D'AMBROSIA DECLARATION --

21           **THE COURT:**  STICKERS, YOU ARE TALKING ABOUT THE

22  STICKERS?

23           **MR. MCBRIDE:**  YEAH, I AM TALKING ABOUT THE STICKER,

24  WHICH DOESN'T HAVE ANY AFFIRMATION IT IS THE STATEMENT OF THE

25  CITY.

1    I WOULD ASK THE COURT TO THINK ABOUT THAT STICKER 30

2   TIMES IN A STORE WITH 30 DIFFERENT PHONES ON EACH CALL-OUT

3   CARD.  AND, YOU KNOW, AS I TRY TO COVER IT UP, THE THING THAT

4   WENT WAS, THIS PHONE IS HEARING AID COMPATIBLE.

5    SO SOME INFORMATION IS GOING TO HAVE TO BE EXCLUDED

6   FOR THE SAN FRANCISCO INFORMATION.  NONE OF THE *ZAUDERER* CASES

7   DO.

8    PUTTING THE CALORIE COUNT ON A MENU OR SAYING THE

9   LIGHT BULB CONTAINS MERCURY, A SIMPLE, TRUE STATEMENT OF FACT,

10  IS SO FAR AWAY FROM THIS THAT, YOU KNOW, WITH ALL DUE

11  RESPECT -- AND THESE GOOD CITY LAWYERS, THEY SIMPLY CAN'T

12  SHOEHORN THIS HUGE DISCLOSURE OF CONTROVERSIAL OPINIONS THAT

13  THE CITY HOLDS INTO CASES THAT SAY YOU CAN PUT A CALORIE COUNT

14  NEXT TO A HAMBURGER.

15    THIS IS LIKE -- IF THE CITY OF NEW YORK IN THE

16  RESTAURANT CASE HAD SAID, NOT JUST THE CALORIE COUNT, YOU HAVE

17  TO PUT NEXT TO THE HAMBURGER, EATING AT FAST FOOD RESTAURANTS

18  IS NOT CONSISTENT WITH A HEALTHY LIFESTYLE.

19    THAT'S THE KIND OF OPINION THAT THE CITY WANTS TO PUT

20  IN OUR STORES, AND THAT IS REALLY -- IF THE CITY CAN DO THAT

21  WITHOUT ANY FIRST AMENDMENT SCRUTINY OR UNDER *ZAUDERER*, WITHOUT

22  CORRECTING ANYTHING WE SAID, THE FIRST AMENDMENT IS REALLY A

23  DEAD LETTER.  THE CITY CAN SPEAK THROUGH ANYONE IN ANY WAY IT

24  WANTS.

25    THE CITY COULD SAY:  WE WANT EVERY STORE IN THE CITY

1  TO ANNOUNCE THAT THE CITY'S POSITION IS THAT ETHICAL SOURCING

2  IS A GOOD THING, OR, THAT EVERY BUILDING IN THE CITY SHOULD BE

3  GREEN.  THAT IS THE CITY TAKING OVER THE DEBATE.

4          THAT IS THE *PG&E* CASE, WHERE JUSTICE POWELL SAID,

5  LOOK, IT DOESN'T MATTER THAT THE SPEECH IS ATTRIBUTED TO THE

6  THIRD PARTY, WHAT MATTERS IS THE CITY IS SETTING THE AGENDA;

7  THE CITY IS SAYING, WELL, WE THINK THAT THESE RETAIL STORES

8  SHOULD BE A PLACE WHERE THESE ISSUES ARE DEBATED.

9          THAT'S NOT RIGHT.  A GOVERNMENTAL ENTITY CAN'T GIVE

10 ITS SIDE OF THE DEBATE IN PUBLIC AND FORCE IT THROUGH A THIRD

11 PARTY.  WHAT IT CAN DO, OBVIOUSLY, IS SPEAK ON ITS OWN WEBSITE,

12 SPEAK IN ITS OWN BUILDINGS.  WHAT IT CAN'T DO IS MAKE THIRD

13 PARTIES, PRIVATE PARTIES, SPEAK.

14         THE THIRD THING I WOULD POINT OUT IS THIS IS A

15 WARNING.  IF THIS ISN'T A WARNING, NOTHING IS A WARNING.

16         THE COURT HAS BEFORE IT THE STEWART DECLARATION.

17 DEAN STEWART TOOK A SURVEY OF THE PRIOR MATERIALS.  THESE

18 MATERIALS ARE WORSE.  THE CONCENTRIC CIRCLES OF RED AROUND THE

19 HEAD AND PELVIC AREA, I DON'T NEED TO EXPLAIN.  IT'S LIKE

20 PLAYING A POLICE SIREN AND SAYING, ARE YOU CONCERNED.  RIGHT

21 BELOW IT, IT SAYS, IF YOU'RE CONCERNED, THE CITY RECOMMENDS...

22 AND, OBVIOUSLY, RECOMMENDATIONS ARE NOT FACTS.  THEY ARE

23 OPINIONS.

24         BUT CLEARLY -- AND THE CITY -- I WOULD POINT THE

25 COURT TO PAGE 11 OF THE CITY'S OPPOSITION BRIEF.  THERE IT

1  ADMITS THAT IF THESE MATERIALS CONVEY THE CONCLUSION THAT FCC

2  PHONES ARE UNSAFE, WE'RE RIGHT, THAT THE FIRST AMENDMENT IS

3  VIOLATED AND IT'S PREEMPTED.  WE'RE RIGHT BECAUSE YOU JUST

4  CAN'T DO THAT.

5          AND I WOULD SUBMIT THAT, YOU KNOW, COMMON SENSE,

6  JUDICIAL COMMON SENSE, TELLS YOU THAT'S WHAT THE MESSAGE THESE

7  MATERIALS SEND.  HOW MANY MOTHERS ARE GOING TO WALK INTO A

8  RETAIL STORE AND SAY, YOU KNOW, I MIGHT NOT BUY A PHONE FOR MY

9  13 YEAR OLD BECAUSE THE CITY HAS GIVEN ME THIS WARNING ABOUT

10 CHILDREN?

11          THE OTHER POINT I WOULD MAKE IS -- AND THIS IS A

12 PRACTICAL POINT -- IS THAT THERE'S AFFIRMATIVE HARM TO THE

13 CITY'S RECOMMENDATIONS, AND WHAT WE'RE ASKING IS THAT THE

14 COURT -- THIS IS THE OFFICE OF RULE 65, REALLY, THE CLASSIC

15 OFFICE OF RULE 65, MAINTAIN STATUS QUO.

16          NOW, THE CITY STARTED THIS PROCESS IN JUNE OF 2010.

17 AND A LITTLE HISTORY IS IMPORTANT HERE.  I KNOW THE COURT

18 DOESN'T HAVE A LOT OF TIME.  BUT, YOU KNOW, THE CITY HAD A

19 DIFFERENT REGIME.  WE CAME FORWARD WITH EXPERTS THAT SAID,

20 YOU'RE WRONG, THIS IS HIGHLY MISLEADING.  THE CITY THEN

21 ABANDONED THAT REGIME.

22          MY POINT IS -- TWO POINTS.  ONE, THE CITY GOT IT

23 WRONG BEFORE, AND THE COURT SHOULDN'T LET THESE MATERIALS OUT

24 INTO THE PUBLIC REALM BECAUSE WE THINK THE CITY'S GOTTEN IT

25 WRONG AGAIN.  ONCE THAT BELL IS RUNG, IT CAN'T BE UNRUNG.

1   THAT'S IRREPARABLE INJURY.  THAT'S AT THE HEART OF IRREPARABLE

2   INJURY, ALONG WITH THE INJURY THAT WE HAVE AS A MATTER OF LAW

3   UNDER THE FIRST AMENDMENT.

4           THE SECOND POINT IS I WOULD ASK THE COURT

5   RESPECTFULLY TO ASK MR. CHHABRIA, WHAT'S THE RUSH?  JULY 10TH,

6   2010, IS WHEN THEY ENACTED THE FIRST ORDINANCE.  THEY FOUND OUT

7   THEY WERE IN ERROR.  THEY'RE CANDID ABOUT THAT IN THEIR PAPERS.

8   THEY CORRECT IT.  BUT THAT'S 15 MONTHS SINCE THEY STARTED THIS

9   PROCESS.  THE WORLD HASN'T ENDED.  ON THE OTHER HAND, WE

10  CLEARLY HAVE IRREPARABLE INJURY UNDER THE FIRST AMENDMENT.  SO

11  THE CITY -- WHY WOULD THE CITY SAY, WE HAVE TO GET THIS INTO

12  EFFECT RIGHT AWAY?

13          THE FIRST ORDINANCE ACTUALLY HAS A SIX-MONTH RAMP-UP

14  PERIOD, WHICH ALLOWED US TO LITIGATE IT IN A SUMMARY JUDGMENT

15  FASHION BEFORE YOUR HONOR.  I THINK EVERYONE RECOGNIZES THIS IS

16  A SUMMARY JUDGMENT CASE.  THIS TIME THE COMPLIANCE PERIOD IS 15

17  DAYS.  AGAIN, I'D ASK THE CITY, WHY 15 DAYS?

18          I THINK, YOUR HONOR, THAT THE -- GIVEN THE SERIOUS

19  LEGAL QUESTIONS HERE UNDER THE FIRST AMENDMENT, AND THEY ARE

20  VERY, VERY SERIOUS, THAT THE COURT SHOULD MAINTAIN THE STATUS

21  QUO; THAT ONCE THESE MATERIALS ARE OUT IN PUBLIC, WE FEEL THAT

22  THEY'RE ALARMIST MATERIALS, THEY HAVE FALSE STATEMENTS IN THEM,

23  AND THEY WILL, IN FACT, INJURE OUR BUSINESS.

24          AND I THINK THE COURT CAN SEE THE MULTIPLICITY OF

25  MATERIALS -- I GUESS THAT WOULD BE MY FINAL POINT ON THE FIRST

1  AMENDMENT, THAT NONE OF THE *ZAUDERER* CASES AUTHORIZE THIS KIND

2  OF PLETHORA OF MATERIAL TO BE FORCED ONTO A PRIVATE PARTY.

3         WE HAVE THREE DIFFERENT CHANNELS OF SPEECH HERE.  THE

4  POSTER HAS TO BE PLACED IN A PROMINENT PLACE IN OUR STORE.  SO

5  PART OF OUR WALLS ARE TAKEN UP WITH A MESSAGE THAT WE DISAGREE

6  WITH AND THAT OUR PRODUCT IS SOMEHOW DEFECTIVE.

7         SECONDLY, WE HAVE TO HAND OUT THE FACT SHEET TO

8  EVERYONE WHO BUYS A PHONE, TO EVERYONE WHO BUYS A PHONE, AND IN

9  VERIZON'S CASE --

10         **THE COURT:**  OR ANYONE WHO REQUESTS IT.

11         **MR. MCBRIDE:**  OR ANYONE WHO REQUESTS IT.

12         BUT IN VERIZON'S CASE, WITH THEIR PAPERLESS

13  INITIATIVE, THAT WILL BE THE ONLY PIECE OF PAPER YOU GET WITH

14  THE PHONE.

15         SO, AND THEN THE THIRD --

16         **THE COURT:**  I DON'T UNDERSTAND THAT PART.  IF

17  SOMEBODY BUYS A VERIZON PHONE, THEY DON'T GET A MANUAL?

18         **MR. MCBRIDE:**  THE MANUAL IS AVAILABLE ONLINE, AND

19  THEY GET A RECEIPT BY E-MAIL.  THAT'S THE WAY TO DO IT WITHOUT

20  ANY PAPER, YOUR HONOR.

21         **THE COURT:**  ALL RIGHT.

22         **MR. MCBRIDE:**  I GUESS THE THIRD CHANNEL IS THE

23  STICKER.  SO I ASKED THE COURT EARLIER TO IMAGINE 30 OR 40

24  PHONES IN THE STORE WITH THAT STICKER ON EACH ONE OF THOSE

25  CALL-OUT CARDS THAT THE COURT HAS BEFORE IT -- I MEAN, THE CITY

1   HAS TAKEN OVER THE STORE TO DELIVER ITS MESSAGE.

2          **THE COURT:** THIS IS THE -- (INDICATING).

3          **MR. MCBRIDE:** YES.

4          **THE COURT:** YOU'VE GOT TO STICK IT ON THERE

5   SOMEWHERE, BUT THERE'S NOT ENOUGH ROOM.

6          **MR. MCBRIDE:** THAT'S MY POINT, YOUR HONOR. *ZAUDERER*

7   DOESN'T ALLOW THE CITY TO ESSENTIALLY REPLACE OUR SPEECH WITH

8   ITS SPEECH. SO EVEN UNDER THE *ZAUDERER* TEST, THE CITY FAILS.

9          SO WE WOULD ASK THE COURT TO ENTER A PRELIMINARY

10  INJUNCTION, MAINTAIN STATUS QUO, AND ALLOW THIS CASE TO BE

11  LITIGATED TO SUMMARY JUDGMENT. AND WE THINK UNDER THE NINTH

12  CIRCUIT STANDARD, CLEARLY -- FIRST OF ALL, WE THINK WE HAVE A

13  HIGH LIKELIHOOD OF SUCCESS ON THE FIRST AMENDMENT.

14         SECONDLY, IRREPARABLE INJURY, WE HAVE IT AS A MATTER

15  OF LAW. THERE'S NO DOUBT THAT WE'RE MAKING LAWFUL AT LEAST

16  COMMERCIAL SPEECH IN OUR STORES AND IT'S IMPACTED BY THIS

17  ORDINANCE.

18         SECONDLY, THERE'S CERTAINLY A SERIOUS QUESTION, A

19  SERIOUS CONSTITUTIONAL QUESTION THAT THE COURT IS GOING TO HAVE

20  TO GRAPPLE WITH HERE, AND THE BALANCE OF THE EQUITIES IS

21  SOLIDLY ON OUR SIDE. I CAN'T THINK OF ANY HARM TO THE CITY OR

22  THE PUBLIC FROM WAITING AND GIVING THE COURT AN OPPORTUNITY TO

23  LITIGATE THESE ISSUES.

24         I THINK THERE'S GOING TO BE SOME EXPERT DISCOVERY AND

25  THEN SUMMARY JUDGMENT MOTIONS BEFORE THE COURT. WE WOULD ASK

1   THE COURT TO ENTER A PRELIMINARY INJUNCTION UNTIL IT REACHES

2   FINAL JUDGMENT IN THIS MATTER.

3          THANK YOU.

4          **MR. CHHABRIA:**  YOUR HONOR, MAY I ADDRESS THE FIRST

5   AMENDMENT ISSUES BEFORE WE TURN TO PREEMPTION?

6          **THE COURT:**  OKAY.  GO AHEAD.

7          **MR. CHHABRIA:**  THANK YOU.

8          I'D LIKE TO START WITH MR. MCBRIDE'S COMMENT ABOUT

9   TAKING OVER THE DEBATE, BECAUSE I THINK THAT'S CENTRAL TO THEIR

10  PAPERS, AND IT'S CENTRAL TO THEIR FIRST AMENDMENT ARGUMENT.

11          THEY ARGUE THE CITY, BY REQUIRING THE CELLPHONE

12  STORES TO PROVIDE THESE MATERIALS, IS TAKING OVER THE DEBATE.

13  AND THE ANALOGY, OF COURSE, IS TO CASES INVOLVING GOVERNMENTAL

14  INTRUSION UPON PARADES, NEWSPAPERS, NEWSLETTERS, CHARITABLE

15  SOLICITATIONS.  AND I KNOW ON THE COMMON-SENSE LEVEL IT'S CLEAR

16  THAT A RETAIL STORE IS NOT LIKE A PARADE OR A NEWSLETTER, BUT I

17  WANT TO TALK FOR A MINUTE DOCTRINALLY ABOUT WHY THEIR RELIANCE

18  ON THOSE CASES IS MISPLACED.

19          IN EACH OF THOSE INSTANCES, THE GOVERNMENT REGULATION

20  WAS IMPOSED UPON SPEECH.  A PARADE, OF COURSE, IS A MODE OF

21  EXPRESSION.  THE GOVERNMENT REGULATION IN *HURLEY* WAS IMPOSED

22  UPON THE PARADE, IMPOSED UPON SPEECH.  OF COURSE, YOU ARE GOING

23  TO ALTER THE CONTENT OF THE SPEECH WHEN YOU IMPOSE SPEECH UPON

24  SPEECH.  SAME IS TRUE OF A NEWSPAPER, A NEWSLETTER, A

25  CHARITABLE SOLICITATION.

1          HERE WE ARE NOT IMPOSING ANY REQUIREMENT UPON SPEECH.

2    WE ARE IMPOSING A REQUIREMENT UPON THE SALE OF A CELLPHONE.

3    OUR REGULATION IS NOT TRIGGERED BY ANY SPEECH.  IT IS TRIGGERED

4    BY THE SALE OF A PRODUCT.

5          **THE COURT:**  WELL, THAT'S NOT QUITE RIGHT.  YOUR

6    REGULATION REQUIRES THAT THIS STICKER BE PASTED ON THE DISPLAY

7    ADVERTISEMENTS IN THE STORE.

8          **MR. CHHABRIA:**  WELL, THAT'S TRUE.  SO THERE IS A

9    SLIGHT DISTINCTION --

10          **THE COURT:**  IT DOESN'T EVEN SAY THAT THIS COMES FROM

11    THE CITY AND COUNTY OF SAN FRANCISCO.  FOR ALL THE CUSTOMER IS

12    GOING TO KNOW, SAMSUNG IS TELLING YOU YOUR HEAD AND BODY ABSORB

13    RF ENERGY FROM CELLPHONES; IF YOU WISH TO REDUCE YOUR EXPOSURE,

14    ASK FOR SAN FRANCISCO'S FREE FACT SHEET.

15          I MEAN, THIS LOOKS LIKE IT COMES FROM SAMSUNG.  HOW

16    CAN YOU POSSIBLY SAY YOU'RE NOT IMPOSING SPEECH ON SPEECH?

17          **MR. CHHABRIA:**  WELL, I DISAGREE WITH A COUPLE OF

18    PREMISES OF YOUR HONOR'S QUESTIONS.

19          **THE COURT:**  LET'S HEAR THAT.

20          **MR. CHHABRIA:**  FIRST AND VERY IMPORTANTLY, THAT IS A

21    SLIGHT DISTINCTION BETWEEN THE STICKER, ON THE ONE HAND, AND

22    THE POSTER AND THE FACT SHEET ON THE OTHER.  SO BOOKMARK THAT.

23          NUMBER TWO --

24          **THE COURT:**  A SLIGHT DISTINCTION?

25          **MR. CHHABRIA:**  WELL, HERE'S WHY I THINK IT'S SLIGHT.

1          **THE COURT:**  LET'S LOOK AT WHAT YOU SAY IS SLIGHT.

2          AT LEAST THE POSTER, WHICH IS 11-BY-17, HAS THE CITY

3    AND COUNTY SEAL AT THE TOP IN TWO PLACES.  THEN IT'S GOT DOWN

4    AT THE BOTTOM, "THIS MATERIAL WAS PREPARED BY THE CITY AND

5    COUNTY OF SAN FRANCISCO AND MUST BE PROVIDED TO CONSUMERS UNDER

6    LOCAL LAW."  SO IF SOMEBODY AT LEAST READS THIS CAREFULLY

7    ENOUGH, THEY'LL REALIZE THIS IS THE CITY AND COUNTY OF SAN

8    FRANCISCO TALKING AND NOT SAMSUNG TALKING.  BUT IF THEY SEE THE

9    STICKER, THEY'RE NOT GOING TO APPRECIATE THAT DISTINCTION.  YOU

10   SAY IT'S A SUBTLE DISTINCTION.  I DON'T THINK I AGREE WITH

11   THAT.

12         **MR. CHHABRIA:**  HERE'S WHY I THINK IT'S A SLIGHT

13   DISTINCTION, COUPLE OF REASONS.  NUMBER ONE, IT DOES SAY, ASK

14   FOR SAN FRANCISCO'S FACT SHEET, AND THERE IS A POSTER IN THE

15   STORE WHICH MAKES REFERENCE TO SAN FRANCISCO'S MATERIALS.

16   THAT'S NUMBER ONE.

17         NUMBER TWO, I JUST WANT TO MAKE CLEAR THAT BECAUSE --

18   MERELY BECAUSE THE STICKER IS REQUIRED TO BE POSTED WITH

19   DISPLAY MATERIALS DOESN'T MEAN IT IS INTERFERING WITH SPEECH

20   INTRUDING UPON SPEECH.  THIS IS STILL A COMMERCIAL TRANSACTION,

21   AND THIS IS STILL AN OFFER TO PURCHASE A CELLPHONE.

22         THERE'S NO RULE THAT SAYS THAT THESE CALL-OUT CARDS

23   HAVE TO BE A CERTAIN SIZE.  THERE'S NO RULE THAT SAYS THEY

24   CAN'T INCREASE THE SIZE OF THEIR CALL-OUT CARD TO ACCOMMODATE

25   THE CITY'S STICKER.

1          ALL OF THAT SAID, YOU KNOW, I CONCEDE TO YOUR HONOR

2    THERE IS A DISTINCTION IN THAT REGARD, AND SOMEONE DOES NOT

3    HAVE TO LOOK EVEN CAREFULLY AT THE CITY'S POSTER OR THE CITY'S

4    FACT SHEET TO KNOW IT'S BROUGHT TO YOU BY THE CITY AND COUNTY

5    OF SAN FRANCISCO.  THOSE MATERIALS SCREAM THAT OUT, AND I DO

6    CONCEDE TO YOUR HONOR THAT THE STICKER IS A LITTLE MORE SUBTLE

7    IN THAT REGARD.

8          BUT MY MAIN POINT IS THAT A RETAIL STORE IS NOT,

9    EITHER FROM A DOCTRINAL PERSPECTIVE OR A COMMON SENSE

10   PERSPECTIVE A NEWSLETTER, AND THIS IS NOT A SITUATION IN WHICH

11   THE CITY IS REQUIRING SOMEBODY TO ALTER TO THEIR EDITORIAL

12   COMMENT.  IT IS A DISCLOSURE REQUIREMENT IN WHICH THE

13   GOVERNMENT IS REQUIRING A COMPANY TO PROVIDE INFORMATION ABOUT

14   A PRODUCT IN CONNECTION WITH THE SALE OF THAT PRODUCT.

15         **THE COURT:**  BUT DO YOU AGREE THAT UNDER THE -- THAT

16   THE LAW WOULD REQUIRE -- FIRST AMENDMENT LAW WOULD -- FOR YOU

17   TO IMPOSE THIS, THE INFORMATION HAS TO BE ACCURATE; IT HAS TO

18   BE FACTUAL AND ACCURATE?

19         **MR. CHHABRIA:**  IT IS FACTUAL AND ACCURATE.

20         **THE COURT:**  ALL RIGHT.  SO YOU SAY, IF YOU'RE

21   CONCERNED ABOUT POTENTIAL HEALTH EFFECTS FROM CELLPHONE RF

22   ENERGY, THE CITY AND COUNTY OF SAN FRANCISCO RECOMMENDS... AND

23   ONE OF THEM IS USING BELT CLIPS AND PURSES TO KEEP DISTANCE

24   BETWEEN YOUR PHONE AND BODY.  NOW, THE BELT CLIP THEY GAVE ME

25   WITH MY PHONE, IT MUST BE 1/8TH OF AN INCH.

1          **MR. CHHABRIA:**  WELL, IF YOU GO TO THE --

2          **THE COURT:**  YOU ARE SAYING 1/8TH OF AN INCH MAKES A

3    DIFFERENCE BETWEEN CARRYING IT ON YOUR BODY -- IT SAYS, DO NOT

4    CARRY ON YOUR BODY TO AT LEAST MEET THE DISTANCE SPECIFIED IN

5    YOUR PHONE USER'S MANUAL?

6          **MR. CHHABRIA:**  IT MAKES A BIG DIFFERENCE.  AND THE

7    PHONE USERS' MANUALS MAKE CLEAR IT MAKES A BIG DIFFERENCE.  AS

8    A MATTER OF FACT, MOTOROLA'S USER MANUAL, WHICH IS ATTACHED AS

9    EXHIBIT F TO OUR REQUEST FOR JUDICIAL NOTICE -- EXCUSE ME -- TO

10   THE DECLARATION OF CAITLIN SANDERS, STATES THERE MAY BE SERIOUS

11   HEALTH PROBLEMS IF YOU DO NOT USE A MOTOROLA-APPROVED BELT CLIP

12   AND IF YOU DO NOT KEEP YOUR PHONE THAT FAR AWAY FROM YOUR BODY.

13   SO, ABSOLUTELY --

14         **THE COURT:**  THAT FAR AWAY IS 1/8TH OF AN INCH?

15         **MR. CHHABRIA:**  IT'S A BIG DEAL.

16         **THE COURT:**  THAT'S A BIG DEAL?

17         **MR. CHHABRIA:**  IT'S A BIG DEAL.  AND MOST OF THE USER

18   MANUALS SPECIFY --

19         **THE COURT:**  WHERE DOES THAT SCIENCE COME FROM?

20         **MR. CHHABRIA:**  THAT SCIENCE, EVEN THE

21   MANUFACTURERS --

22         **THE COURT:**  JUST GIVE ME THE REAL SCIENCE, NOT WHAT

23   THE PROPAGANDA IS.

24         I DO KNOW SOMETHING ABOUT RADIO FREQUENCY ENERGY.  I

25   KNOW SOMETHING ABOUT THIS SCIENCE.  AND I UNDERSTAND THAT THE

1   CLOSER YOU ARE TO THE SOURCE, THE MORE INTENSE IT IS.  IT'S BY

2   THE LAW OF SQUARES.  I UNDERSTAND THAT.  BUT 1/8TH OF AN INCH

3   IS PRETTY CLOSE.  AND YOU'RE SUGGESTING THAT 1/8TH OF AN INCH

4   IS OKAY AS LONG AS YOU ARE USING A BELT CLIP, A LEATHER BELT

5   CLIP, BUT IF YOU HAD THE THING LOOSE IN YOUR POCKET, THAT THAT

6   IS MUCH MORE DANGEROUS?  I DON'T UNDERSTAND THE SCIENCE BEHIND

7   THAT SUGGESTION.

8          **MR. CHHABRIA:**  ALL I CAN SAY, YOUR HONOR -- AND I'M

9   NOT -- YOU KNOW, I'M NOT AN EXPERT ON THE SCIENCE EITHER, BUT

10  ALL PARTIES AGREE -- AND THIS IS WHAT THE DISCLOSURE MATERIALS

11  SAY, IS THE FURTHER AWAY FROM YOUR BODY THAT YOU KEEP YOUR

12  PHONE, THE MORE YOU WILL REDUCE EXPOSURE.  AND YES, 5/8THS OF

13  AN INCH -- AND IT'S USUALLY 5/8THS OF AN INCH THAT THE USER

14  MANUALS --

15         **THE COURT:**  5/8THS OF AN INCH, THERE'S NO WAY YOU

16  WILL BE 5/8THS OF AN INCH IF YOU USE A BELT CLIP.  THAT'S NOT

17  GOING TO BE 5/8THS OF AN INCH AWAY FROM YOUR BODY.  WHERE DOES

18  THAT NUMBER COME FROM?

19         **MR. CHHABRIA:**  IF THAT'S THE CASE ABOUT YOUR BELT

20  CLIP, YOUR HONOR, THEN YOU ARE USING YOUR PHONE IN A WAY WHERE

21  THE PHONE IS NOT COMPLIANT WITH THE FCC'S REGULATIONS, BECAUSE

22  THE USER MANUALS MAKE CLEAR THAT IF YOU DO NOT KEEP YOUR PHONE

23  AT LEAST A SMALL DISTANCE AWAY FROM YOUR BODY, YOUR PHONE MAY

24  EXCEED FCC IMPOSED LIMITS.  AND, AS I MENTIONED, THE MOTOROLA

25  USER MANUAL SAYS THIS COULD CAUSE SERIOUS HEALTH EFFECTS IN THE

1    LONG TERM.

2            SO GOING BACK TO THE DISCLOSURE MATERIALS, THERE'S --

3    YOU KNOW, OUR STATEMENT IN THE DISCLOSURE MATERIALS ABOUT

4    KEEPING THE PHONE AWAY FROM YOUR BODY IS NOT INACCURATE AND

5    IT'S NOT MISLEADING.

6            GOING BACK TO WHAT MR. MCBRIDE SAID, I MEAN, HE CAME

7    OUT OF THE BOX SAYING THAT THE CITY IS REQUIRING THE RETAILERS

8    TO PROVIDE DISCLOSURE MATERIALS WHICH TALK ABOUT HOW THE FCC

9    HAS DONE ITS JOB AND WHETHER CELLPHONES ARE SAFE.  THERE'S

10   NOTHING IN THE DISCLOSURE MATERIALS WHICH TALKS ABOUT HOW THE

11   FCC HAS DONE ITS JOB, AND THERE'S NOTHING IN THE DISCLOSURE

12   MATERIALS WHICH TAKES A POSITION ON WHETHER CELLPHONES ARE

13   SAFE.

14           THE ONLY THING THE DISCLOSURE MATERIALS DOES -- DO IS

15   THE SAME THING THAT THE WORLD HEALTH ORGANIZATION DOES, WHICH

16   IS SAY THAT CELLPHONES -- RADIO FREQUENCY EMISSIONS FROM

17   CELLPHONES ARE A POSSIBLE CARCINOGEN, THERE IS A POTENTIAL

18   HEALTH ISSUE HERE, AND IF YOU'RE CONCERNED ABOUT IT, HERE ARE

19   SOME MEASURES YOU CAN TAKE TO REDUCE THE -- YOUR EXPOSURE TO

20   RADIO FREQUENCY EMISSIONS FROM CELLPHONES.

21           **THE COURT:**  WHAT DO YOU SAY TO THE CRITICISM OF THE

22   FACT SHEET WHERE IT SAYS, LIMITING CELLPHONE USE BY CHILDREN

23   DEVELOPING BRAINS AND THINNER SKULLS LEAD TO HIGHER ABSORPTION

24   IN CHILDREN?  WHAT IS THE SCIENTIFIC BASIS FOR THAT?

25           **MR. CHHABRIA:**  ON THE ONE SIDE, WE HAVE

1  MR. PETERSEN'S DECLARATION, AND I'LL GET TO THAT IN A MOMENT,

2  SUBMITTED BY CTIA.

3           ON THE OTHER SIDE, YOU HAVE -- THE ONE STATEMENT

4  THAT WE QUOTED FOR YOU IN OUR BRIEF WAS THE STATEMENT FROM THE

5  WORLD HEALTH ORGANIZATION, WHICH SAYS, "WHEN USED BY

6  CHILDREN -- " I'M QUOTING EXACTLY NOW.

7                   "WHEN USED BY CHILDREN, THE AVERAGE

8              RF ENERGY DEPOSITION IS TWO TIMES HIGHER IN

9              THE BRAIN AND UP TO TEN TIMES HIGHER IN THE

10             BONE MARROW OF THE SKULL COMPARED WITH MOBILE

11             PHONE USE BY ADULTS."

12          THERE ARE ALSO -- JUST IF I COULD BRIEFLY STATE FOR

13  THE RECORD, A NUMBER OF OTHER STUDIES THAT WERE BEFORE THE

14  BOARD OF SUPERVISORS MAKE ESSENTIALLY THE SAME POINT, AND I

15  WON'T RATTLE OFF THE NAMES OF THE STUDIES BECAUSE IT WILL TAKE

16  TOO LONG, BUT JUST VERY BRIEFLY.  OUR SUPPLEMENTAL REQUEST FOR

17  JUDICIAL NOTICE, EXHIBIT S; SAME REQUEST FOR JUDICIAL NOTICE,

18  EXHIBIT FF; SAME ONE, EXHIBIT O; SAME ONE, EXHIBIT JJ; SAME

19  ONE, EXHIBIT F; SAME ONE, EXHIBIT D; AND SAME ONE, EXHIBIT Z.

20  ALL OF THOSE STUDIES MAKE THE SAME POINT THAT THE WORLD HEALTH

21  ORGANIZATION MAKES.  SO WE HAVE --

22          **THE COURT:**  WHICH IS AGAIN?

23          **MR. CHHABRIA:**  SORRY.

24          **THE COURT:**  WHAT DOES THE WORLD HEALTH ORGANIZATION

25  SAY?

1          **MR. CHHABRIA:**

2                    "WHEN USED BY CHILDREN, THE AVERAGE

3          RF ENERGY DEPOSITION IS TWO TIMES HIGHER IN

4          THE BRAIN AND UP TO TEN TIMES HIGHER IN THE

5          BONE MARROW OF THE SKULL COMPARED WITH THE

6          MOBILE PHONE USE BY ADULTS."

7          A BRIEF NOTE ABOUT MR. PETERSEN'S DECLARATION, WHICH

8 IS WHAT CTIA PUTS UP AGAINST THIS, IN THEIR ORIGINAL DEPOSITION

9 FILED WITH THEIR MOVING PAPERS, HE STATED THAT THIS STATEMENT

10 THAT WE WERE MAKING IN OUR DISCLOSURE MATERIALS WAS INACCURATE.

11 IN HIS REPLY DECLARATION, UPON BEING CONFRONTED WITH THE

12 STATEMENT FROM THE WORLD HEALTH ORGANIZATION, HE SAID, WELL, AS

13 A MINIMUM, THIS IS CONTROVERSIAL AS A SCIENTIFIC MATTER

14 BECAUSE -- AND I -- I DO FIND THAT THE PETERSEN REPLY

15 DECLARATION, CANDIDLY, DIFFICULT TO UNDERSTAND.

16          SO IF I MISCHARACTERIZE IT, I URGE MR. MCBRIDE TO

17 CORRECT ME.  CANDIDLY, I'M NOT ATTEMPTING TO MISCHARACTERIZE

18 IT; I JUST FIND IT HARD TO FOLLOW.

19          BUT I BELIEVE THAT WHAT MR. PETERSEN'S REPLY

20 DECLARATION IS SAYING IS, LOOK, PEOPLE MIGHT GET THE WRONG IDEA

21 ABOUT THIS FROM THIS STATEMENT BECAUSE THE SAR MEASUREMENT OF

22 RADIATION INTO CHILDREN'S AND ADULTS BRAINS WILL BE THE SAME.

23 BUT I THINK -- IF I UNDERSTAND IT CORRECTLY, I THINK THAT'S

24 DIFFERENT FROM WHAT THE WORLD HEALTH ORGANIZATION IS SAYING AND

25 WHAT WE'RE SAYING IN OUR DISCLOSURE MATERIALS, WHICH IS THAT

1  THE DEPOSITION INTO THE BRAIN IS DEEPER, WHICH IS DIFFERENT, I

2  THINK, FROM SAYING THAT THERE'S A CONCENTRATION -- THERE'S A

3  HEAVIER CONCENTRATION IN A PARTICULAR SQUARE INCH OF TISSUE.

4          SO, YOU KNOW, I THINK THE PETERSEN DECLARATION AT

5  BEST IS SLIPPERY.  I THINK THAT, YOU KNOW, THE CHANGING

6  POSITION FROM THE ORIGINAL PETERSEN DECLARATION, TO THE

7  PETERSEN DECLARATION FILED WITH THEIR MOVING PAPERS, TO THE

8  PETERSEN REPLY DECLARATION, THE FACT THAT IT'S SORT OF MOVING

9  THE GOAL LINE ON US WHEN YOU COMPARE IT TO ALL OF THE MATERIALS

10 WE HAVE TO SUPPORT OUR POSITION, IT'S NOT ENOUGH.  IT'S

11 CERTAINLY NOT ENOUGH TO JUSTIFY FOR THAT ONE -- IF YOU ARE JUST

12 FOCUSING ON THAT ONE SENTENCE, AN INJUNCTION AGAINST THE CITY'S

13 ORDINANCE.

14          **THE COURT:**  WHAT DO YOU SAY TO THE POINT THAT THE FCC

15 SET THE LEVEL AT 50 -- IN OTHER WORDS, A 50-FOLD SAFETY FACTOR,

16 SO THAT, YES, IT'S TRUE THAT CELLPHONES EMIT RADIO FREQUENCY

17 ENERGY, OF COURSE, JUST LIKE LIGHT BULBS EMIT LIGHT ENERGY, BUT

18 THAT THE LEVELS ARE SET AT SUCH A LOW LEVEL THAT IT'S DEEMED TO

19 BE SAFE FOR EVERYBODY?

20          WHAT DO YOU SAY TO THAT SCIENCE THAT THE FCC, WHO'S

21 BEEN IN THE BUSINESS OF RADIO SINCE 1934, THEY OUGHT TO KNOW

22 WHAT THEY'RE TALKING ABOUT?

23          **MR. CHHABRIA:**  WELL, I'D POINT YOU PRIMARILY TO

24 EXHIBIT G TO OUR REQUEST FOR JUDICIAL NOTICE, WHICH IS ANOTHER

25 DOCUMENT FROM THE WORLD HEALTH ORGANIZATION, WHICH ANSWERS YOUR

1    QUESTION, AND I'LL DO SO BRIEFLY HERE.

2            **THE COURT:**  BUT THEY HAVEN'T BEEN IN THE BUSINESS

3    SINCE 1934.  THEY ARE JUST THE WORLD HEALTH ORGANIZATION, FOR

4    GOODNESS SAKES.  WHERE DO THEY GET OFF CONTRADICTING THE FCC?

5            **MR. CHHABRIA:**  YOUR HONOR, I MEAN, THE WORLD HEALTH

6    ORGANIZATION'S CONCLUSION THAT CELLPHONE RADIO FREQUENCY ENERGY

7    IS A POSSIBLE CARCINOGEN IS --

8            **THE COURT:**  POSSIBLE?

9            **MR. CHHABRIA:**  POSSIBLE.

10           **THE COURT:**  ANYTHING IS POSSIBLE.  STAND OUT IN THE

11   SUNSHINE LONG ENOUGH, IT'S A POSSIBLE CARCINOGEN.

12           **MR. CHHABRIA:**  THAT'S RIGHT.  AND IT'S POSSIBLE THAT

13   A PREGNANT WOMAN DRINKING ALCOHOL COULD EXPERIENCE PROBLEMS.

14           **THE COURT:**  THAT'S BEEN PROVEN.  THAT'S BEEN PROVEN.

15           **MR. CHHABRIA:**  ACTUALLY, I DISAGREE.

16           **THE COURT:**  CAN YOU CITE A SINGLE EXAMPLE WHERE

17   ANYBODY USING CELLPHONES HAS EVER GOTTEN CANCER?

18           **MR. CHHABRIA:**  THERE IS NO -- ALL PARTIES AGREE THAT

19   THERE IS NO SCIENTIFIC PROOF EITHER WAY ON WHETHER SOMEBODY HAS

20   GOTTEN CANCER FROM CELLPHONES, NO SCIENTIFIC PROOF EITHER WAY.

21   BUT TO ANSWER --

22           **THE COURT:**  SO YOU'RE ASKING THEM TO PROVE A

23   NEGATIVE, THAT NO ONE HAS EVER GOTTEN IT.  BUT IT'S A LOT

24   EASIER TO PROVE A POSITIVE.  NO ONE -- YOU CAN'T PROVE THAT A

25   SINGLE PERSON IN THE HISTORY OF THE UNIVERSE HAS EVER GOTTEN

1    CANCER FROM USING A CELLPHONE.

2              **MR. CHHABRIA:**   THAT'S NOT -- THE STATEMENT THAT IT'S

3    A LOT EASIER TO PROVE A POSITIVE THAN A NEGATIVE IS

4    RESPECTFULLY, YOUR HONOR, NOT CORRECT, AND THE WORLD HEALTH

5    ORGANIZATION EXPLAINS WHY.  BECAUSE THE -- AND THIS GETS TO

6    YOUR --

7              **THE COURT:**   IN THE 1950'S WHEN I WAS GROWING UP, THE

8    HEALTH PEOPLE WANTED TO PUT FLUORIDATION IN THE WATER SUPPLY IN

9    ORDER TO PROTECT CHILDREN, IN ORDER TO PREVENT CAVITIES.

10   HISTORY HAS SHOWN THAT WAS A GOOD IDEA.  BUT WHEN I WAS GROWING

11   UP THERE WAS NO END OF MUNICIPALITIES WHO THOUGHT IT WAS A

12   COMMUNIST CONSPIRACY AND THAT FLUORIDATION WOULD SAP YOUR

13   PRECIOUS BODILY FLUIDS.  SO IT WAS NOT PERMITTED IN ONE

14   MUNICIPALITY AFTER ANOTHER ON THE VERY THEORY THAT IT HASN'T

15   BEEN PROVEN THAT IT WON'T DO SOME HARM.

16             YOU THINK ABOUT THAT.  THAT'S REALLY WHAT YOU'RE

17   SAYING, IS SINCE THEY CAN'T PROVE IT WILL NEVER CAUSE CANCER,

18   LET'S NOT DO IT.  LET'S RESTRICT THE USE OF CELLPHONES, OR,

19   MAKE THEM PUT OUT INFORMATION THAT SCARES PEOPLE THAT THEY'RE

20   GOING TO GET CANCER WHEN, IN FACT, NO ONE HAS EVER GOTTEN

21   CANCER.  IT CAN'T BE PROVEN.

22             **MR. CHHABRIA:**   YOUR HONOR.  THINK ABOUT THE

23   IMPLICATIONS OF WHAT YOU'RE SAYING.  IT SEEMS TO ME WHAT YOU'RE

24   SAYING IS WE HAVE TO WAIT UNTIL SCIENTIFIC PROOF THAT A PRODUCT

25   KILLS PEOPLE BEFORE WE CAN WARN SOMEBODY ABOUT THE POTENTIAL

1  RISKS.  THAT'S NOT THE RULE.  THAT'S NEVER BEEN THE RULE.  AND

2  THAT WOULD BE HIGHLY IMPRACTICABLE.  THINK ABOUT IT.

3          WE -- YOU KNOW, THE WORLD HEALTH ORGANIZATION HAS

4  IDENTIFIED A POSSIBLE RISK.  THE STUDIES, THE RECENT STUDIES

5  THAT THE WORLD HEALTH ORGANIZATION RELIES UPON HAVE IDENTIFIED

6  THAT THERE IS A POSSIBLE RISK.  THOSE STUDIES, INCIDENTALLY, TO

7  GO BACK TO --

8          **THE COURT:**  POSSIBLE.

9          **MR. CHHABRIA:**  -- TO GO BACK TO YOUR 1/50TH

10 QUESTION --

11         **THE COURT:**  BUT THE FCC HAS CONCLUDED AFTER

12 VOLUMINOUS STUDY -- AND THEY'RE EXPERTS, NOT THE WORLD HEALTH

13 ORGANIZATION.  THE FCC HAS CONCLUDED THAT IT'S SAFE OR AT

14 LEAST -- I WON'T GO SO FAR AS TO SAY SAFE, BUT THAT THEY HAVE

15 SET THE LEVEL AT SUCH A SAFETY FACTOR OF 50 THAT IT'S A GOOD

16 COMPROMISE.  IT'S HEAVILY WEIGHTED IN FAVOR OF SAFETY.

17         **MR. CHHABRIA:**  THE SAFETY --

18         **THE COURT:**  SHOULDN'T WE GIVE A LOT OF DEFERENCE TO

19 THE PEOPLE WHO KNOW WHAT THEY'RE TALKING ABOUT, AS OPPOSED TO

20 THE WORLD HEALTH ORGANIZATION?  THE BEST THEY CAN DO IS SAY

21 POSSIBLE.  POSSIBLE?  ANYTHING IS POSSIBLE.  IT'S POSSIBLE UFOS

22 ARE GOING TO COME DOWN.

23         **MR. CHHABRIA:**  IT SEEMS A LOT LESS LIKELY --

24         **THE COURT:**  I HAVE BROCHURES ABOUT UFOS AND IF YOU'RE

25 CONCERNED ABOUT UFOS, HERE ARE THE STEPS YOU CAN TAKE.

 1       **MR. CHHABRIA:**  I THINK THE DIFFERENCE BETWEEN THOSE

 2  TWO EXAMPLES IS THAT IF THE CITY REQUIRED PEOPLE TO TALK ABOUT

 3  UFOS, THERE WOULD BE NO BASIS FOR THE CITY TO CONCLUDE THERE'S

 4  A POSSIBILITY --

 5       **THE COURT:**  THERE'S PLENTY OF AIR FORCE DOCUMENTS IN

 6  THE BLUE BOOK FROM THE 1950'S ALL ABOUT UFOS AND THE

 7  POSSIBILITY OF FLYING SAUCERS.

 8       **MR. CHHABRIA:**  YOUR HONOR, WITH RESPECT, I THINK THAT

 9  BELITTLES THE CONCLUSIONS OF THE PEOPLE WHO HAVE LOOKED AT THIS

10  ISSUE FOR A VERY LONG TIME.

11       **THE COURT:**  HOW LONG DID THEY LOOK AT IT?  THE AGENCY

12  IN QUESTION GAVE THE PUBLIC TWO WEEKS, NOTICE OF THE

13  REGULATION, AND TWO WEEKS LATER, TWO WEEKS, THE CITY AND COUNTY

14  OF SAN FRANCISCO DEPARTMENT OF THE ENVIRONMENT ISSUED ITS

15  REGULATION.

16       **MR. CHHABRIA:**  YOUR HONOR, THIS ISSUE HAS BEEN

17  STUDIED FOR DECADES, AND THE WORLD HEALTH ORGANIZATION HAS BEEN

18  LOOKING AT THE ISSUE FOR DECADES.

19       I WOULD ADD YOU MAKE REFERENCE TO THE FCC STATEMENTS,

20  BUT THE FCC HAS MADE CLEAR AND THE UNITED STATES GOVERNMENT HAS

21  MADE CLEAR THAT THEY'VE ENGAGED IN A BALANCING AND THAT, IN

22  FACT, THE COMPETING -- THEY HAVE TO MAKE A TRADEOFF BETWEEN --

23  BETWEEN EFFICIENCY AND REDUCING RISK TO HUMAN -- OF HUMAN

24  EXPOSURE CAUSED BY CELLPHONES.

25       ONE DOCUMENT THAT I DIDN'T POINT OUT TO YOU IN MY

1  SUPPLEMENTAL BRIEF IN THAT REGARD IS ONE THAT THE OTHER SIDE

2  DID CITE ON PAGES 18 AND 19 OF ITS OPENING BRIEF, AND IT'S A

3  BRIEF BY THE UNITED STATES IN THE *CELLULAR TASKFORCE* CASE.

4          **THE COURT:**  THAT WAS A BRIEF BY A LAWYER.  I LOOKED

5  VERY HARD.  THE GOVERNMENT IN THAT CASE -- I READ THE BRIEF.  I

6  WENT AND GOT IT.  I READ THE BRIEF.  YOU ARE RIGHT, THAT'S WHAT

7  THE LAWYERS SAID.  THAT'S THE LAWYER'S SPIN ON WHAT THE FCC

8  ACTUALLY SAID, WHICH WAS THEY WEIGHTED IT, THEY HAD A BIG

9  SAFETY FACTOR IN THERE, AND THAT PART IS TRUE, BUT THEY NEVER

10  WENT SO FAR AS TO SAY THE FCC ITSELF HAS NEVER, NEVER FOUND

11  IT'S ABSOLUTELY SAFE.

12          **MR. CHHABRIA:**  BUT THE FCC MADE CLEAR THEY WERE

13  ENGAGING IN --

14          **THE COURT:**  YOU ARE RIGHT ABOUT THAT.  I GUESS I'M

15  AGREEING WITH YOU THEY DID A BALANCING.  THEY WEIGHED RISK

16  AGAINST CONVENIENCE AND THE NEED FOR CELLPHONE INFRASTRUCTURE

17  AND ALL OF THAT, AND YOU ARE RIGHT ABOUT THAT.  I THINK THE

18  INDUSTRY IS WRONG, THE FCC NEVER FOUND IT WAS ABSOLUTELY SAFE.

19  SO, I THINK YOU'RE --

20          **MR. CHHABRIA:**  AND --

21          **THE COURT:**  I AGREE WITH YOU ON THAT POINT.

22          **MR. CHHABRIA:**  AND THE FCC HAS ACKNOWLEDGED THAT

23  FURTHER STUDIES ARE CONTINUING, THAT THE SCIENCE IS DEVELOPING,

24  AND THAT WE MAY NEED TO CHANGE THESE REGULATIONS.

25          NOW WE'RE IN A POSITION WHERE NOBODY IS WILLING TO

1   SAY, EXCEPT FOR CTIA, THAT THERE IS NO POSSIBLE RISK ASSOCIATED

2   WITH CELLPHONE USE.  THE WORLD HEALTH ORGANIZATION SAYS THERE'S

3   A POSSIBLE RISK.  THE FCC CITES TO THE WORLD HEALTH

4   ORGANIZATION'S FACT SHEET WHICH EXPLAINS WHY THERE IS A

5   POSSIBLE CARCINOGEN -- WHY CELLPHONE RADIATION IS A POSSIBLE

6   CARCINOGEN AND WHY PEOPLE SHOULD TAKE STEPS TO REDUCE THEIR

7   EXPOSURE.

8           SO, THE -- I DON'T -- I JUST DON'T THINK THIS IS THE

9   SAME THING AS UFOS.  AND THE CITY CANNOT POSSIBLY BE REQUIRED

10  TO WAIT UNTIL THERE IS SCIENTIFIC PROOF THAT PEOPLE WILL BE

11  KILLED FROM A CELLPHONE AND SCIENTIFIC PROOF THAT THE REASON

12  THEY DIED WAS BECAUSE OF A CELLPHONE.

13          **THE COURT:**  THINK ABOUT IT FOR A SECOND.  YOU KNOW,

14  EVEN THE INFRASTRUCTURE, THE AC INFRASTRUCTURE, EMITS EMF AND

15  RADIO FREQUENCY AT LOW FREQUENCIES.  WE'VE HAD THAT A HUNDRED

16  YEARS.  WE'VE HAD THE SUTRO TOWER SINCE THE '70'S, BY MY

17  MEMORY, AND IT'S BEEN BEAMING, BEAMING, EVEN AS WE SPEAK,

18  HEAVY-DUTY RADIO FREQUENCY AT US FOR DECADES.  WE ARE BATHED IN

19  RADIO FREQUENCY.  SO IF SOMEBODY WAS GOING TO GET CANCER FROM

20  RADIO FREQUENCY, YOU THINK IT WOULD HAVE HAPPENED BY NOW.

21          **MR. CHHABRIA:**  NO, AND THAT'S THE POINT OF THE

22  STUDIES THAT HAVE BEEN GOING ON OVER THE PAST SEVERAL DECADES.

23          **THE COURT:**  REALLY, IT'S A VERY LONG-ACTING CANCER.

24  WHEN IS IT GOING TO APPEAR?

25          **MR. CHHABRIA:**  LET ME GIVE YOU ONE EXAMPLE THAT THE

1   WORLD HEALTH ORGANIZATION CITES, AND THAT'S WHEN THE BOMB WAS

2   DROPPED IN HIROSHIMA.  THAT HAPPENED, IF I REMEMBER CORRECTLY,

3   IN 1950, AND IT WASN'T FOR TWO DECADES --

4          **THE COURT:**  IT HAPPENED IN 1945, IN AUGUST OF 1945.

5   PLEASE.  COME ON.  1950 WAS FIVE YEARS AFTER THE WAR.

6          **MR. CHHABRIA:**  WELL, THEN -- AND FORGIVE ME, I WASN'T

7   BORN AT THAT TIME.  BUT THE POINT -- IT MAKES MY POINT EVEN

8   STRONGER, WHICH IS THAT, YOU KNOW, THE WORLD HEALTH

9   ORGANIZATION CITES THAT EXAMPLE AS A REASON WHY WE NEED TO BE

10  CONCERNED ABOUT THIS.  BECAUSE IT TAKES A LONG -- NUMBER ONE,

11  IT TAKES A LONG TIME FOR BRAIN TUMORS TO MANIFEST, AND, NUMBER

12  TWO, THE CAUSE -- THE CONCERN ABOUT THESE STUDIES IS THAT BRAIN

13  TUMORS ARE CAUSED BY LONG-TERM USE OF CELLPHONES, AND WE LIVE

14  IN AN ERA NOW WHERE PEOPLE USE THEIR PHONES STARTING AT MUCH

15  YOUNGER AGE, THEY USE THEIR PHONES MUCH MORE FREQUENTLY, AND

16  THEY USE THEIR PHONES MUCH LONGER TERM, AND THEY'RE HOLDING

17  THEM UP AGAINST THEIR HEAD.

18         **THE COURT:**  ALL RIGHT.  I'VE GOT A LOT MORE HEARINGS

19  TODAY.  I WANT TO GIVE THEM A CHANCE TO RESPOND ON THE OTHER

20  ISSUE, AND I WILL GIVE YOU A CHANCE TO RESPOND TO IT, TOO.

21  LET'S GO TO PREEMPTION ISSUE.

22         **MR. CHHABRIA:**  I APPRECIATE YOUR HONOR'S PATIENCE.

23         **THE COURT:**  TIME IS SHORT.

24         **MR. DUFFY:**  I UNDERSTAND.  I'LL BE VERY BRIEF.  I CAN

25  PICK UP FROM WHEN THE DISCUSSION WAS.

 1          **THE COURT:**  ON THE PREEMPTION, LOOK, I AGREE THE FCC

 2  IS EXPERT, BUT THERE'S NOTHING IN THE LAW THAT SAYS IT PREEMPTS

 3  STATEMENTS LIKE THIS, SO I DON'T SEE HOW YOU CAN ARGUE

 4  PREEMPTION.

 5          **MR. DUFFY:**  HERE'S WHERE THE CONFLICT LIES, YOUR

 6  HONOR.  I THINK WE AGREE ON WHAT THE LEGAL TEST IS WITH RESPECT

 7  TO PREEMPTION.  THE *FARINA* CASE FOLLOWS A LONG LINE OF CASES

 8  THAT SAYS WHEN AN AGENCY BALANCES TWO POTENTIALLY COMPETING

 9  INTERESTS, A STATE LAW THAT INTERFERES WITH THAT BALANCE IS

10  PREEMPTED.

11          **THE COURT:**  IT'S NOT INTERFERING WITH IT.  HOW DOES

12  IT INTERFERE WITH IT?

13          **MR. DUFFY:**  WELL, LET ME START WITH THE CONFLICT IN

14  THE APPROACH, AND THEN I'LL TALK ABOUT THE EFFECTS, AND I WILL

15  BE BRIEF.  BUT I WANT TO START WITH THE APPROACH, BECAUSE I

16  THINK IT TOUCHES ON WHAT YOUR HONOR WAS JUST TALKING ABOUT WITH

17  MR. CHHABRIA.

18          WHEN THE FCC LOOKED AT THIS ISSUE, THEY TOOK 150

19  COMMENTS THAT TOOK TWO YEARS.  IT WAS A VERY SIGNIFICANT

20  EXERCISE.  WHAT THEY DID WAS THEY SAID, WE'RE GOING TO BASE OUR

21  REGULATORY APPROACH ON SCIENCE, ESTABLISHED SCIENCE.  SO THERE

22  ISN'T ANYWHERE DEBATE OUT THERE ABOUT THE 1.6 SAR STANDARD; IN

23  OTHER WORDS, THE ISSUE OF THERMAL EFFECTS.  THERE'S NOT A LOT

24  OF CONTROVERSY ABOUT THAT.  THE INTERNATIONAL SCIENTIFIC

25  COMMUNITY CAME TOGETHER AND SAID, AT A CERTAIN POINT YOU HAVE

1  THERMAL EFFECTS THAT COULD HARM HUMANS, AND THEN YOU BACK DOWN

2  FROM THAT 50-FOLD AND YOU SET A STANDARD.  THE DEBATE HASN'T

3  BEEN ABOUT THAT.

4        IF YOU LOOK AT THE CRITICISM THE FCC HAS GOTTEN IN

5  THE *CELLPHONE TASKS FORCE* CASE AND AT THE CIRCUIT LEVEL, IT'S

6  BEEN ABOUT THIS QUESTION OF SHOULD WE REGULATE ON THE BASIS OF

7  SCIENTIFIC UNCERTAINTY.  IN OTHER WORDS, SHOULD WE TAKE

8  ADDITIONAL REGULATORY ACTION TO ADDRESS THIS IDEA THAT THERE IS

9  NOT ABSOLUTE CERTAINTY IN THE SCIENCE.

10        AND THE FCC -- WHAT THE CITY AND COUNTY OF SAN

11  FRANCISCO DOES IN THIS CASE IS TAKE THE VERY OPPOSITE APPROACH

12  THAT THE FCC TOOK.  THE FCC SAID, NO, WE'RE GOING TO MONITOR

13  AND -- WE'RE GOING TO MONITOR THE SCIENCE, WE'RE GOING TO BE

14  VIGILANT, AND IF SCIENCE DEVELOPS THAT CAUSES US TO TAKE A

15  DIFFERENT OR ADDITIONAL APPROACH, WE WILL DO SO.

16        IN PARAGRAPH ONE OF THE CITY'S ORDINANCE THEY SAY,

17  IT'S THE POLICY OF THE CITY OF SAN FRANCISCO TO ADHERE TO THE

18  PRECAUTIONARY PRINCIPLE WHICH PROVIDES THAT THE GOVERNMENT

19  SHOULD NOT WAIT FOR SCIENTIFIC PROOF OF A HEALTH OR SAFETY

20  RISK.

21        THERE IS YOUR CONFLICT, YOUR HONOR.

22        **THE COURT:**  BUT THEY DIDN'T GO SO FAR AS TO TRY TO

23  BAR THE SALE OF THESE CELLPHONES.  WHAT THEY SAID WAS, OKAY, WE

24  WANT TO INFORM THE PUBLIC ABOUT, ASSUMING THAT THE CELLPHONES

25  ARE GOING TO BE SOLD ANYWAY -- THEY ARE NOT TRYING TO STOP

1  CELLPHONES FROM BEING SOLD; THEY'RE TRYING TO GIVE CUSTOMERS

2  SOME TIPS -- THAT'S REALLY THE WAY TO DESCRIBE IT -- TIPS ON

3  HOW TO REDUCE EXPOSURE TO CELLPHONE.  AND IF IT'S TRUE THAT THE

4  INDUSTRY'S OWN MANUALS CALL OUT THE SAME PROBLEM, WHAT'S WRONG

5  WITH THAT?

6          **MR. DUFFY:**  WELL, IT ALTERS THE BALANCE IN THIS

7  SENSE, JUDGE:  THE FCC WAS BALANCING RF HEALTH AND SAFETY AND

8  ALSO THE ADVANCEMENT OF WIRELESS TECHNOLOGY.  SO WHEN YOU TELL

9  PEOPLE TO TURN OFF PHONES, WHEN YOU DISCOURAGE PEOPLE FROM

10  ADOPTION AND USAGE OF THE TECHNOLOGY, YOU ALTER THAT BALANCE.

11          I THINK IT WOULD TAKE A FULL --

12          **THE COURT:**  WAIT A MINUTE.  THE FCC HAS NEVER SAID

13  EVERYONE OUGHT TO BE WIRED IN 24/7.  THAT'S RIDICULOUS.  WHERE

14  DID YOU GET THAT IDEA?

15          **MR. DUFFY:**  IT'S NOT A FEDERAL LAW, SIR, YOU HAVE TO

16  KEEP YOUR PHONE ON.  ABSOLUTELY, I AGREE.

17          **THE COURT:**  PEOPLE CAN BE OFF THE GRID.  THERE'S NO

18  FCC POLICY YOU HAVE TO HAVE YOUR PHONE ON -- YOU DON'T EVEN

19  HAVE TO HAVE A PHONE.  THE FCC NEVER SAID THAT.  COME ON.

20  THAT'S A HUGE STRETCH.  THAT'S A VERY WEAK ARGUMENT.  THAT THE

21  FCC -- IF YOU TURN YOUR PHONE OFF, YOU'RE THWARTING FCC POLICY

22  BY NOT BEING HOOKED INTO THE SYSTEM.

23          **MR. DUFFY:**  AND I WAS TRYING TO EMPHASIZE -- THAT WAS

24  NOT THE POINT I WAS MAKING.  MY POINT WAS SIMPLY THAT THE

25  ADVANCEMENT OF NEW TECHNOLOGIES IS ONE OF THE FEDERAL POLICIES

1  AT STAKE WHEN THE FCC WAS DOING THE BALANCING.  SO IF YOU TIP

2  IT IN FAVOR OF SAYING DON'T USE PHONES UNTIL THEY'RE ABSOLUTELY

3  PROVEN SAFER, WHENEVER OR HOWEVER THAT MIGHT OCCUR, THAT'S THE

4  PRACTICAL CONFLICT.

5          **THE COURT:**  YES, BUT -- I SEE THAT.  BUT HERE'S THE

6  THING, THEY WENT BACK AND REWROTE THEIR FACT SHEET TO TRY TO

7  GET IT DOWN TO FACTOIDS THAT ARE TRUE, YOU KNOW, AS FAR AS THEY

8  GO.  IN OTHER WORDS, USING A HEADSET OR A SPEAKERPHONE OR

9  TEXTING, THE PHONE IS FURTHER AWAY FROM YOUR BODY SO THAT

10 INCREASES DISTANCE.  THAT'S TRUE.

11         **MR. DUFFY:**  BUT THE FUNDAMENTAL NOTION, YOUR HONOR,

12 THAT CELLPHONES ARE DANGEROUS IS THE OVERARCHING MESSAGE, AND

13 THAT IS AT WAR WITH THE FCC CONCLUSION.

14         **THE COURT:**  IT DOESN'T SAY THEY'RE DANGEROUS.  IT

15 SAYS, IF YOU'RE CONCERNED ABOUT POTENTIAL HEALTH EFFECTS FROM

16 CELLPHONE RF ENERGY, THE CITY AND COUNTY OF SAN FRANCISCO

17 RECOMMENDS...  THEN IT RECOMMENDS.  THE WORD "DANGER" IS NOT ON

18 THERE.

19         **MR. DUFFY:**  AS MR. MCBRIDE POINTED OUT, YOUR HONOR, I

20 THINK THE OVERARCHING MESSAGE OF THE POSTER AND THE GRAPHICS

21 AND THE ENTIRE MESSAGE SUGGESTS THAT THERE IS -- THERE'S ONE

22 THING MISSING FROM THE MESSAGE YOU'LL NOTICE, YOUR HONOR; THAT

23 IS, THIS PHONE HAS BEEN CERTIFIED SAFE BY THE FCC AND LICENSED

24 FOR SALE.  YOU ARE NOT GOING TO FIND THAT IN ANY --

25         **THE COURT:**  THAT IS NOT A TRUE STATEMENT.  IT HAS NOT

1   BEEN CERTIFIED AS SAFE.  THAT'S YOUR SPIN ON WHAT THEY DID.

2   BUT THE FCC NEVER SAID IT'S ABSOLUTELY SAFE IN ALL

3   CIRCUMSTANCES.  WHAT IT SAYS WAS WE'RE DOING A 50-FOLD BALANCE.

4   THAT PART IS TRUE.  SO, IN THEIR JUDGMENT, BASED ON THE SAR

5   LEVELS AND SO FORTH, THEY SET IT AT A LEVEL THAT THE RADIATION

6   IS SO LOW THAT THEY DON'T THINK IT'S GOING TO DO -- WHATEVER

7   HARM IT'S GOING TO DO IS SMALL.

8           BUT THEY NEVER SAID THERE IS NO ONE WHO'S EVER GOING

9   TO GET CANCER OR BE HARMED REGARDLESS OF THE EXTENT OF USE.  SO

10  MAYBE YOU'VE GOT SOME TEENAGER WHO'S GLUED TO THE CELLPHONE WHO

11  USES IT 24/7, AND THAT'S THE EXCEPTIONAL CASE, AND SO SAN

12  FRANCISCO'S TRYING TO ADDRESS THAT PROBLEM HERE.  I DON'T KNOW.

13  I DON'T THINK THE FCC WENT AS FAR AS YOU'RE CONTENDING.

14          **MR. DUFFY:**  WELL, YOUR HONOR, THAT'S OUR POINT, IS

15  THAT IF WE AGREE THAT THE LEGAL TEST IS AN ALTERING OF THE

16  BALANCE, OUR ARGUMENT IS THAT THIS TIPS THE BALANCE THAT THE

17  FCC STRUCK, FUNDAMENTALLY OPPOSES THE FCC'S CONCLUSION.

18          **THE COURT:**  IT'S NOT MY JOB TO -- I CAN'T START

19  TELLING PEOPLE WHAT THEY CAN AND CAN'T SAY AND WHAT THEY CAN'T

20  MAKE YOU DISCLOSE UNLESS IT VIOLATES THE FIRST AMENDMENT.

21  THEN, OF COURSE, THE JUDGE HAS GOT TO DO THAT.  BUT IT'S NOT --

22  I'VE EXPRESSED SOME VIEWS HERE TODAY TO TRY TO TEST IT OUT.

23  BUT IT'S NOT MY JOB TO MEDIATE WHAT IS THE ULTIMATE SCIENCE

24  HERE.  THAT'S NOT WHAT I DO.

25          BOTH SIDES CAN HAVE THEIR SAY ON THAT.  AND THE

1  QUESTION IS WHETHER OR NOT THESE RULES VIOLATE THE FIRST

2  AMENDMENT OR ARE PREEMPTED, THOSE ARE MUCH MORE NARROWER LEGAL

3  ISSUES.

4       **MR. DUFFY:**  THERE'S A REASON THAT OUR FIRST AMENDMENT

5  ARGUMENT COMES FIRST, I AGREE.

6       **THE COURT:**  LET ME ASK YOU BOTH THIS:  DO YOU WANT TO

7  RESPOND ON PREEMPTION?  I'M GOING TO -- I WOULD LIKE TO ASK YOU

8  WHETHER OR NOT THE CITY AND COUNTY WILL POSTPONE THE

9  IMPLEMENTATION OF THIS FOR A WHILE SO I CAN DECIDE THIS WITHOUT

10 HAVING TO WORRY ABOUT A DEADLINE?  BECAUSE I THINK THE DEADLINE

11 IS TUESDAY, RIGHT?

12      **MR. CHHABRIA:**  LET ME BRIEFLY SPEAK WITH MY CLIENT

13 ABOUT THAT.

14      **THE COURT:**  ALL RIGHT.  I THINK I CAN GET A DECISION

15 OUT IN TWO WEEKS OR LESS, SO IT MIGHT EVEN BE NEXT WEEK, BUT I

16 HAVE TO -- SO I'M NOT ASKING FOR A LONG EXTENSION.

17           (PAUSE IN PROCEEDINGS.)

18      **MR. CHHABRIA:**  I EXPLAINED TO MY CLIENT, YOUR HONOR,

19 THAT YOU ARE VERY CONSCIENTIOUS IN GETTING YOUR ORDERS OUT, SO

20 THE CITY IS WILLING TO SUSPEND ENFORCEMENT OF THE ORDINANCE

21 UNTIL YOU GET YOUR ORDER OUT.

22      **THE COURT:**  THAT'S GREAT.  I WILL GET IT OUT SOON, SO

23 YOU DON'T HAVE TO WORRY TOO MUCH.

24      **MR. CHHABRIA:**  I DO WANT TO MAKE -- PROVIDE ONE LAST

25 RESPONSE AND IT'S -- I DON'T GET THE SENSE THAT YOUR HONOR

 1   NEEDS TO HEAR ANYTHING ON THE PREEMPTION, BUT MR. MCBRIDE'S

 2   POINT ABOUT THE BALANCE OF HARMS AND THE PUBLIC INTEREST, I

 3   JUST WANT TO MAKE ONE VERY BRIEF POINT ABOUT THAT.

 4          **THE COURT:**  CAN I REPHRASE WHAT HE SAID?  I DO WANT

 5   YOU TO RESPOND.

 6          THE CLASSIC ARGUMENT IN THIS CIRCUMSTANCE IS:  WE'VE

 7   LIVED WITHOUT THIS ORDINANCE FOR A HUNDRED YEARS SINCE THE

 8   HISTORY OF RADIO, AND NOW THAT IT'S COME ALONG, WHY NOT

 9   PRESERVE THE STATUS QUO, WHAT'S THE RUSH, LET THE DISTRICT

10   COURT AND THE NINTH CIRCUIT HAVE A CRACK AT THIS BEFORE THE

11   STORES HAVE TO DO ALL OF THESE POSTERS.  SO WHAT DO YOU SAY TO

12   THAT?

13          **MR. CHHABRIA:**  WELL, TWO POINTS.  EVEN IF ONE

14   CONCLUDES THAT THERE ARE SERIOUS QUESTIONS ON THE FIRST

15   AMENDMENT ISSUE, THERE'S STILL A BALANCING OF THE PUBLIC

16   INTEREST, AND THERE ARE TWO ELEMENTS TO THAT.

17          THE FIRST ELEMENT IS THAT -- AND I WILL ANSWER YOUR

18   QUESTION ABOUT WHAT'S THE RUSH, I PROMISE.  BUT THE FIRST

19   ELEMENT OF THE INQUIRY IS WHAT IS THE LEVEL OF FIRST AMENDMENT

20   HARM?  WE KNOW IF THERE'S A FIRST AMENDMENT VIOLATION,

21   IRREPARABLE HARM IS PRESUMED, BUT WE STILL HAVE TO ASK WHAT IS

22   THE DEGREE OF THIS HARM.  THAT'S WHAT THE *SAMMARTANO* CASE OUT

23   OF THE NINTH CIRCUIT THAT BOTH PARTIES CITE TELL US.  IN THIS

24   CASE WE KNOW FROM *ZAUDERER* A DISCLOSURE REQUIREMENT IMPLICATES

25   THE FIRST AMENDMENT IN A MUCH LESS SERIOUS WAY THAN A

1   RESTRICTION ON SPEECH.

2          WE DON'T HAVE A SITUATION IN WHICH ANYBODY ELSE'S

3   FIRST AMENDMENT RIGHTS ARE IMPLICATED OTHER THAN THE RETAILERS

4   AND ONLY IN THIS VERY LIMITED WAY -- AND AS A MATTER OF FACT,

5   THE WHOLE POINT OF THE FIRST AMENDMENT IS TO PROMOTE THE

6   EXCHANGE OF IDEAS.  SO TO THE EXTENT YOU BALANCE THE RETAILER'S

7   INTEREST AGAINST THE PUBLIC'S INTEREST, THE PUBLIC IS

8   BENEFITING FROM THE EXCHANGE OF IDEAS BY PERMITTING THIS

9   DISCLOSURE TO GO FORWARD.

10          IN TERMS OF WHAT'S THE RUSH, I GUESS, PRIMARILY, WHAT

11  I WOULD SAY TO YOUR HONOR IS THIS:  IT'S TRUE THAT WE HAVEN'T

12  HAD A REGULATION LIKE THIS ANYWHERE IN THE COUNTRY BEFORE,

13  AND -- BUT IT'S NOT AT ALL CLEAR THAT PEOPLE ARE NOT BEING

14  HARMED BY THE ABSENCE OF SUCH A REGULATION.

15          AND THERE IS AN IMPORTANT -- THERE IS A DIFFERENCE

16  THAT I THINK THAT CTIA DOES NOT TAKE PROPER ACCOUNT OF BETWEEN

17  A VOLUNTARY DECISION TO DELAY ENFORCEMENT -- IN ORDER TO GET IT

18  RIGHT, IN ORDER TO RESPECT THE REASONABLE OBJECTIONS SUBMITTED

19  BY ANOTHER SIDE IN LITIGATION THAT DIDN'T PARTICIPATE IN PUBLIC

20  COMMENT, AND SO THIS WAS THE FIRST TIME FOR THE CITY TO TAKE

21  INTO ACCOUNT THE REASONABLE OBJECTIONS SUBMITTED BY CTIA.

22          THERE'S A VERY BIG DIFFERENCE BETWEEN A VOLUNTARY

23  ENFORCEMENT DELAY DECISION BY A RESPONSIBLE PUBLIC ENTITY WHO'S

24  TAKING INTO ACCOUNT REASONABLE CONCERNS AND A COURT-ORDERED

25  INJUNCTION WHICH PREVENTS FROM TAKING PLACE EFFECT LEGISLATION

1   THAT WAS DULY ENACTED BY THE REPRESENTATIVES OF THE PEOPLE.

2   AND THAT'S THE POINT THAT THE *GOLDEN GATE RESTAURANT*

3   *ASSOCIATION* CASE MAKES, WHICH WE CITE AT THE END OF OUR BRIEF,

4   VERY END OF OUR BRIEF, AND THAT'S ALL.  THANK YOU.

5            **MR. MCBRIDE:**  MIGHT I HAVE ONE OR TWO POINTS ON THE

6   FIRST AMENDMENT?  I KNOW THE COURT IS PRESSED FOR TIME.

7            **THE COURT:**  ONE POINT.

8            **MR. MCBRIDE:**  AND ONE FACTUAL CORRECTION IF I COULD?

9            THE POINT IS THERE ARE MANY CASES THAT PROTECT

10  COMMERCIAL SPEECH.  MR. CHHABRIA IS ALMOST IN THE POSITION OF

11  REVERSING 35 YEARS OF SUPREME COURT JURISPRUDENCE ON THE FIRST

12  AMENDMENT.  HE'S BASICALLY SAYING WE HAVE NO PROTECTION FOR

13  COMMERCIAL SPEECH IN THAT STORE.  WE DO, IN FACT, HAVE SUCH

14  PROTECTION.

15           HE'S NOW ADMITTING THAT HE'S CHANGING OUR SPEECH.  HE

16  SAYS, LET THEM INCREASE THE SIZE OF THE CARD.  HOW MUCH CAN

17  THEY DO BEFORE THEY'VE IMPINGED UPON THE FIRST AMENDMENT?

18           THE FACTUAL POINT I WANTED TO MAKE IS THE W.H.O., THE

19  W.H.O. HAS EVALUATED OVER 800 SUBSTANCES.  THEY'VE ONLY FOUND

20  THAT ONE IS PROBABLY NOT CARCINOGENIC.  IN OTHER WORDS, I THINK

21  YOUR HONOR HIT THE NAIL RIGHT ON THE HEAD.  THESE SCIENTISTS

22  SPEAK DIFFERENTLY THAN WHEN WE DO.  WHEN THEY SAY "POSSIBLY

23  CARCINOGENIC," THEY MEAN IT HASN'T BEEN PROVEN THAT IT ISN'T

24  CARCINOGENIC.  THAT'S WHY COFFEE AND PICKLES ALSO ARE THERE AS

25  POSSIBLE CARCINOGENIC.

```
 1              I WANTED TO READ TO THE COURT -- THIS IS FROM -- THIS

 2    IS DOCUMENT 61 IN THE COURT'S DOCKET, WHICH IS THE DECLARATION

 3    OF RONALD PETERSEN.  HE QUOTES FROM THE W.H.O. REPORT.  AFTER

 4    THE W.H.O. MAKES THE CATEGORIZATION OF POSSIBLY CARCINOGENIC,

 5    IT SAYS THIS.  IT SAYS:

 6                        "A LARGE NUMBER OF STUDIES HAVE

 7                   BEEN PERFORMED OVER THE LAST TWO DECADES TO

 8                   ASSESS WHETHER MOBILE PHONES POSE A POTENTIAL

 9                   HEALTH RISK.  TO DATE, NO ADVERSE HEALTH

10                   EFFECTS HAVE BEEN ESTABLISHED AS BEING CAUSED

11                   BY MOBILE PHONE USE."

12              SO THE W.H.O. IS NOT INCONSISTENT WITH THE FCC.  WHAT

13    IT'S SAYING IS THERE'S NO EVIDENCE THAT CELLPHONES ARE

14    DANGEROUS IN ANY WAY BUT, YOU KNOW, THEIR CLASSIFICATION IS

15    SUCH THAT EVERYTHING IS A POSSIBLE CARCINOGEN UNTIL IT'S PROVEN

16    DIFFERENTLY.

17              THAT'S OUR POINT ABOUT THAT POSTER.  THAT'S HIGHLY

18    MISLEADING TO TAKE WHAT THE W.H.O. SAID ABOUT CELLPHONES BEING

19    POSSIBLY CARCINOGENIC AND ISOLATE IT BY ITSELF.

20              YOUR HONOR KNOWS -- YOUR HONOR HAS MENTIONED EARLIER,

21    YOU KNOW, YOU CAN PLUCK THINGS OUT AND STICK THEM SOMEWHERE,

22    AND THEY MAY BE TECHNICALLY TRUE BUT HIGHLY MISLEADING.  THAT'S

23    WHAT WE HAVE HERE, BECAUSE IN COMMON PARLANCE "POSSIBLY

24    CARCINOGENIC" FOR THE AVERAGE SAN FRANCISCAN IS NOT GOING TO

25    MEAN, YOU KNOW, NOT DEFINITIVELY EXCLUDED.  IT'S NOT GOING TO
```

1    MEAN THAT NO TEST HAS EVER SHOWN THAT IT'S CAUSED CANCER.

2         I THINK THE FAILURE TO QUOTE SOMEWHERE ON THAT

3    DOCUMENT, ON ANY OF THE DOCUMENTS, THAT THE FCC HAS CERTIFIED

4    THE PHONES AS SAFE OR HAS CERTIFIED THE PHONES DO NOT CAUSE A

5    DANGER TO HUMAN BEINGS IS -- EVERY ONE OF THE MANUALS THAT

6    MR. CHHABRIA POINTED TO, THE USER MANUALS, SAY THAT.  BEFORE

7    THEY SAY ANYTHING ELSE, THEY SAY, LOOK, THE FCC HAS CERTIFIED

8    THIS PHONE FOR SALE IN THE UNITED STATES AND IT MEETS THE SAR

9    STANDARDS OF THE FCC WITH THE 50-FOLD SAFETY FACTOR.  WHY ISN'T

10   THAT USEFUL INFORMATION?

11        I MEAN, I THINK SAN FRANCISCO IS CLEARLY TRYING --

12   THOSE DOCUMENTS, WHETHER OR NOT THEY'RE TRYING TO SEND AN

13   ALARMIST MESSAGE -- I MEAN, WHY THE RED CIRCLES AROUND THE HEAD

14   AND GROIN?  WHAT MESSAGE DOES THAT SEND TO A HUMAN BEING

15   SHOPPING FOR A PHONE?

16        I DIDN'T HEAR ANY REBUTTAL OF THE POINT THAT

17   CHILDREN'S TISSUE DOES NOT ABSORB RF ENERGY IN ANY GREATER

18   PROPORTION THAN ADULT TISSUE.

19        **THE COURT:**  NO.  HE CITED TO SOMETHING IN THE REQUEST

20   FOR JUDICIAL ADMISSION.  I DISAGREE WITH YOU.  COUNSEL DID CITE

21   TO SOMETHING.

22        **MR. MCBRIDE:**  WELL, THERE'S ACTUALLY -- FIRST OF ALL,

23   JUDICIAL NOTICE OF THOUSANDS OF SCIENTIFIC STUDIES FOR THE

24   TRUTH OF WHAT'S ASSERTED THEREIN IS NOT A PROPER USE OF

25   JUDICIAL NOTICE.  WHAT WE DIDN'T SEE IS A DECLARATION ACTUALLY

1  MEETING THE PETERSEN DECLARATION.

2           BUT IF I COULD, YOUR HONOR?  IT TOOK ME A WHILE.

3  IT'S A DIFFICULT SCIENTIFIC POINT.  YES, THE CHILD'S HEAD IS

4  SMALLER, SO THE PLUME ENTERS MORE OF THE CHILD'S HEAD AND BRAIN

5  THAN YOURS OR MINE.  BUT THE POINT IS SAR VALUE REMAINS THE

6  SAME.  THE ACTUAL ABSORPTION OF RF ENERGY IS THE SAME AND IT

7  REMAINS BELOW THE FCC STANDARD.  THEY USE THE WORD "ABSORPTION"

8  THERE.  THAT'S MISLEADING.  THAT'S THE POINT.

9           **THE COURT:**  WE'VE GOT TO BRING IT TO A CLOSE.  I

10  DON'T KNOW THE ANSWER.  WITHIN A WEEK I'LL GET YOU AN ORDER.

11           (PROCEEDINGS ADJOURNED.)

12

13

14

15

16

17

18

19

20

21

22

23

24

25

1

2

3                        **CERTIFICATE OF REPORTER**

4          I, JOAN MARIE COLUMBINI, OFFICIAL REPORTER FOR THE

5    UNITED STATES COURT, NORTHERN DISTRICT OF CALIFORNIA, HEREBY

6    CERTIFY THAT THE FOREGOING PROCEEDINGS IN C 10-3224 WHA, CTIA

7    V. CITY AND COUNTY OF SAN FRANCISCO, WERE REPORTED BY ME, A

8    CERTIFIED SHORTHAND REPORTER, AND WERE THEREAFTER TRANSCRIBED

9    UNDER MY DIRECTION INTO TYPEWRITING; THAT THE FOREGOING IS A

10   FULL, COMPLETE AND TRUE RECORD OF SAID PROCEEDINGS AS BOUND BY

11   ME AT THE TIME OF FILING.

12        THE VALIDITY OF THE REPORTER'S CERTIFICATION OF

13   SAID TRANSCRIPT MAY BE VOID UPON DISASSEMBLY AND/OR

14   REMOVAL FROM THE COURT FILE.

15

16        _____

17            JOAN MARIE COLUMBINI, CSR 5435, RPR

18               THURSDAY, NOVEMBER 3, 2011

19

20

21

22

23

24

25